# Syllabus

Chief Justice:
Robert P. Young, Jr.

Justices:
Stephen J. Markman
Mary Beth Kelly
Brian K. Zahra
Bridget M. McCormack
David F. Viviano
Richard H. Bernstein

**This syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader.**

Reporter of Decisions:
Corbin R. Davis

PEOPLE v LOCKRIDGE

Docket No. 149073. Argued January 15, 2015 (Calendar No. 7). Decided July 29, 2015.

Rahim Omarkhan Lockridge was convicted of involuntary manslaughter for the death of his wife, MCL 750.321, following a jury trial in the Oakland Circuit Court. His minimum sentence range calculated under the sentencing guidelines, MCL 777.1 *et seq.*, was 43 to 86 months. The court, Nanci J. Grant, J., concluded that there were factors not accounted for in scoring the guidelines, including a probation violation, killing his wife in front of their three children, leaving the children at home with their mother dead on the floor, and prior domestic violence. Citing these as substantial and compelling reasons to depart from the minimum sentence range, MCL 769.34(3), the court sentenced defendant to a term of 8 years (96 months) to 15 years (the statutory maximum sentence). Defendant appealed, challenging both the scoring of the guidelines and the trial court's decision to exceed the guidelines minimum sentence range. While his case was pending in the Court of Appeals, the United States Supreme Court decided *Alleyne v United States*, 570 US ___; 133 S Ct 2151 (2013), which extended the rule of *Apprendi v New Jersey*, 530 US 466 (2000), and held that a fact that increases either end of a defendant's sentencing range must have been admitted by the defendant or found by the jury beyond a reasonable doubt. After allowing defendant to file a supplemental brief challenging the guidelines scoring on *Alleyne* grounds, the Court of Appeals, BECKERING, P.J., and O'CONNELL and SHAPIRO, JJ., affirmed defendant's sentence in three separate opinions and rejected the *Alleyne* challenge. Judge O'CONNELL stated in the lead opinion that the panel was bound by *People v Herron*, 303 Mich App 392 (2013), which had rejected the same argument based on *Alleyne*. Judge BECKERING stated in her concurring opinion that had she not been bound by *Herron*, she would have held that requiring judicial fact-finding to set the guidelines mandatory minimum sentence range violated *Alleyne* and that the guidelines should be made advisory to cure the constitutional problem. In his concurring opinion, Judge SHAPIRO stated that he would have held that *Alleyne* only bars requiring judicial fact-finding to set the bottom of the minimum sentence range under the guidelines, so only the bottom of the range needed to be made advisory to cure the constitutional flaw. 304 Mich App 278 (2014). Defendant sought leave to appeal, and the Supreme Court granted his application to address the constitutional question presented by defendant's *Alleyne* challenge. 496 Mich 852 (2014).

In an opinion by Justice MCCORMACK, joined by Chief Justice YOUNG and Justices KELLY, VIVIANO, and BERNSTEIN, Supreme Court *held*:

The *Apprendi* rule, as extended by *Alleyne*, applies to Michigan's sentencing guidelines and renders them unconstitutional to the extent that they require judicial fact-finding beyond facts admitted by the defendant or found by the jury beyond a reasonable doubt to score offense variables that increase the floor of the guidelines minimum sentence range. To remedy the constitutional violation, MCL 769.34(2) must be severed to the extent that it makes mandatory a minimum sentence range calculated on the basis of facts not admitted by the defendant or found by the jury. It was also necessary to strike down the requirement in MCL 769.34(3) that a sentencing court that departs from the applicable range must articulate a substantial and compelling reason for doing so. A guidelines minimum sentence range calculated in violation of *Apprendi* and *Alleyne* is advisory only, but a sentencing court must determine the applicable guidelines range and take it into account when imposing a sentence. Appellate courts must review for reasonableness any sentences that depart from the guidelines range.

1. *Apprendi* held that other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be admitted by the defendant or submitted to a jury and proved beyond a reasonable doubt and that failing to do so violated a defendant's constitutional rights to due process, notice, and trial by jury. Following *Apprendi* and its progeny, all of which addressed determinate sentencing schemes, the Michigan Supreme Court held in *People v Drohan*, 475 Mich 140 (2006), that the rule did not apply to Michigan's indeterminate sentencing scheme, reasoning in part that the sentencing court's power to impose a sentence always derives from the jury's verdict because the jury's verdict authorizes the maximum sentence set by statute. *Alleyne*, however, concluded that mandatory minimum sentences were equally subject to the *Apprendi* rule, holding that a fact that increases either end of the sentence range produces a new penalty and constitutes an ingredient of the offense.

2. Defendant argued that because *Alleyne* extended the *Apprendi* rule from statutory maximum sentences to mandatory minimum sentences, the rule applied to Michigan's sentencing guidelines. A scheme of mandatory minimum sentencing violates the Sixth Amendment if it constrains the discretion of the sentencing court by compelling an increase in the mandatory minimum sentence beyond that authorized by the jury's verdict alone. Michigan's sentencing guidelines do so to the extent that the floor of the guidelines range compels a court to impose a mandatory minimum sentence beyond that authorized by the jury's verdict. Stated differently, to the extent that the floor of the guidelines range is increased by scoring offense variables (OVs) using facts that the court found by a preponderance of the evidence, rather than facts admitted by the defendant or necessarily found by the jury, the procedure violates the Sixth Amendment. Because *Herron* held to the contrary, it must be overruled.

3. Remedying the violation requires that the sentencing guidelines be advisory only. Accordingly, MCL 769.34(2) must be severed to the extent that it makes mandatory the minimum sentence range as scored on the basis of facts beyond those admitted by the defendant or found by the jury. The requirement in MCL 769.34(3) of a substantial and compelling reason to depart from that range must also be struck down. When OVs have been scored on the basis of facts not admitted by the defendant or found beyond a reasonable doubt by the jury, the sentencing court may depart from the resulting minimum sentence range without articulating substantial and compelling reasons for doing so. An appellate court must review for reasonableness a sentence that departs from the applicable range, and resentencing will be

required when a sentence is determined to be unreasonable. Sentencing courts must continue to consult the applicable guidelines range, however, and take it into account when imposing a sentence. Further, sentencing courts must justify the sentence imposed in order to facilitate appellate review.

4. Because defendant did not object to the scoring of the OVs at sentencing on *Apprendi/Alleyne* grounds, the appropriate review in his case was for plain error affecting substantial rights. Defendant received a minimum sentence that was an upward departure that did not rely on the minimum sentence range from the improperly scored guidelines, and the sentencing court stated on the record its reasons for departure, as it was required to do. Therefore, defendant could not show prejudice from any error in scoring the OVs in violation of *Alleyne*. Defendant's guidelines minimum sentence range was irrelevant to the upward departure sentence he ultimately received. Accordingly, he could not show the prejudice necessary to establish plain error and was not entitled to resentencing.

5. With respect to the cases held in abeyance for this case, for those in which (1) facts admitted by the defendant and (2) facts found by the jury were sufficient to assess the minimum number of OV points necessary for the defendant's guidelines score to fall in the cell of the sentencing grid under which he or she was sentenced, that defendant suffered no prejudice from any error. Accordingly, no plain error occurred in those cases, and no further inquiry will be required.

6. For cases held in abeyance in which facts admitted by the defendant or found by the jury's verdict were insufficient to assess the minimum number of OV points necessary for the defendant's guidelines score to fall in the cell of the sentencing grid under which he or she was sentenced, an unconstitutional constraint impaired that defendant's Sixth Amendment right. Those defendants (1) who can demonstrate that their guidelines minimum sentence range was actually constrained by the violation of the Sixth Amendment and (2) whose sentences were not subject to an upward departure can establish a threshold showing of the potential for plain error sufficient to warrant a remand to the sentencing court for further inquiry. *United States v Crosby*, 397 F3d 103 (CA 2, 2005), set forth an analysis under which it was generally appropriate to remand cases on direct review for the limited purpose of permitting the sentencing court to determine whether to resentence under the new sentencing regime and, if so, to resentence. Essentially, a sentence imposed under a mistaken perception of the requirements of law will satisfy plain-error analysis if the sentence imposed under a correct understanding would have been materially different. Accordingly, cases in which the defendant's minimum sentence was established by applying Michigan's sentencing guidelines in violation of the Sixth Amendment should be remanded to the sentencing court for it to determine whether it would have imposed a materially different sentence but for the constitutional error and resentencing if the court so concluded.

7. *Crosby* remands are warranted only in cases involving sentences imposed on or before July 29, 2015, the date of the decision in this case. For defendants sentenced after this decision, traditional plain-error review will apply if the error was unpreserved. On a *Crosby* remand, the sentencing court should first allow the defendant an opportunity to inform the court that he or she will not seek resentencing. If notification is not received in a timely manner, the court (1) should

obtain the views of counsel in some form, (2) may but is not required to hold a hearing on the matter, and (3) need not have the defendant present when it decides whether to resentence the defendant, but (4) must have the defendant present, as required by law, if it decides to resentence the defendant. Further, in determining whether the court would have imposed a materially different sentence but for the unconstitutional constraint, the court should consider only the circumstances existing at the time of the original sentence.

Defendant's sentence affirmed; Michigan sentencing guidelines statutes struck down in part as unconstitutional and severed in part.

Justice MARKMAN, joined by Justice ZAHRA, dissenting, concluded that Michigan's sentencing system did not offend the Sixth Amendment. Under Michigan's indeterminate sentencing guidelines, a defendant's maximum sentence is prescribed by statute, and upon a guilty verdict, the defendant is subject to serving this maximum sentence. Accordingly, the jury's verdict authorizes punishment of the defendant to the maximum extent allowed by the statute under which he or she was convicted. The sentencing court has no influence over this authority and no authority to usurp it. At sentencing, the judge's exercise of judgment is limited to selecting a minimum sentence from within a recommended minimum sentence range that is calculated on the basis of the defendant's prior record variables and offense variables. This minimum sentence, however, merely establishes the defendant's earliest parole eligibility date and has no effect on the punishment imposed on the defendant as a result of the jury's verdict. The defendant has no legal right to be released before the statutory maximum to which he or she has been made subject by the jury's determination, and the defendant has no constitutional right to parole. As a result, an increase in a defendant's minimum parole eligibility date does not expose the defendant to a greater punishment than that authorized by the jury's verdict, and the sentencing court's exercise of judgment in establishing that date does not infringe the jury's authority, as the United States Supreme Court recognized in *Blakely v Washington*, 542 US 296 (2004), with respect to indeterminate sentencing systems. Furthermore, Michigan's indeterminate sentencing guidelines do not produce mandatory minimum sentences. A mandatory minimum sentence is one that requires the sentencing court to impose a statutorily fixed minimum term of incarceration for a particular crime when certain statutory criteria have been satisfied. While some statutes do require a true mandatory minimum, defendants in Michigan generally receive a minimum sentence as a function of a guidelines calculation of prior record and offense variables that produce a recommended minimum sentence range, and that minimum sentence represents only the earliest time at which a defendant can petition for release on parole. Because *Alleyne* only applies to facts that increase mandatory minimum sentences, *Alleyne* does not apply to Michigan's sentencing guidelines. Justice MARKMAN further observed how deeply ironic it was that under the majority's holding, two decisions of the United States Supreme Court that were intended to limit encroachment of the judicial power on the jury's authority, foster predictability and certainty in criminal sentencing, protect defendants' rights, and produce fairness in the sentencing process, among other things, will lead to entirely opposite results. Justice MARKMAN would have affirmed the judgment of the Court of Appeals.

©2015 State of Michigan

# OPINION

Chief Justice:          Justices:
Robert P. Young, Jr.    Stephen J. Markman
                        Mary Beth Kelly
                        Brian K. Zahra
                        Bridget M. McCormack
                        David F. Viviano
                        Richard H. Bernstein

FILED  July 29, 2015

S T A T E  O F  M I C H I G A N

SUPREME COURT

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v                                                No. 149073

RAHIM OMARKHAN LOCKRIDGE,

        Defendant-Appellant.

BEFORE THE ENTIRE BENCH

MCCORMACK, J.

This case presents the question whether the Michigan sentencing guidelines violate a defendant's Sixth Amendment fundamental right to a jury trial.  We conclude that the rule from *Apprendi v New Jersey*, 530 US 466; 120 S Ct 2348; 147 L Ed 2d 435 (2000), as extended by *Alleyne v United States*, 570 US ___; 133 S Ct 2151; 186 L Ed 2d 314 (2013), applies to Michigan's sentencing guidelines and renders them constitutionally deficient.  That deficiency is the extent to which the guidelines *require* judicial fact-finding beyond facts admitted by the defendant or found by the jury to score

offense variables (OVs) that *mandatorily* increase the floor of the guidelines minimum sentence range, i.e. the "mandatory minimum" sentence under *Alleyne*.

To remedy the constitutional violation, we sever MCL 769.34(2) to the extent that it makes the sentencing guidelines range as scored on the basis of facts beyond those admitted by the defendant or found by the jury beyond a reasonable doubt mandatory. We also strike down the requirement in MCL 769.34(3) that a sentencing court that departs from the applicable guidelines range must articulate a substantial and compelling reason for that departure.[1]

Consistently with the remedy imposed by the United States Supreme Court in *United States v Booker*, 543 US 220, 233; 125 S Ct 738; 160 L Ed 2d 621 (2005), we hold that a guidelines minimum sentence range calculated in violation of *Apprendi* and *Alleyne* is advisory only and that sentences that depart from that threshold are to be reviewed by appellate courts for reasonableness. *Booker*, 543 US at 264. To preserve as much as possible the legislative intent in enacting the guidelines, however, we hold that a sentencing court must determine the applicable guidelines range and take it into account when imposing a sentence. *Id.*

In this case the defendant's guidelines minimum sentence range was irrelevant to the upward departure sentence he ultimately received. Accordingly, we hold that he

---

[1] To the extent that any part of MCL 769.34 or another statute refers to use of the sentencing guidelines as mandatory or refers to departures from the guidelines, that part or statute is also severed or struck down as necessary.

cannot show the prejudice necessary to establish plain error under *People v Carines*, 460 Mich 750; 597 NW2d 130 (1999), and we affirm his sentence.[2]

## I. FACTUAL BACKGROUND AND PROCEDURAL HISTORY

The defendant was convicted by a jury of involuntary manslaughter for his wife's death. At sentencing, defense counsel agreed with scoring OV 3 (physical injury to victim)[3] at 25 points and OV 5 (psychological injury to member of victim's family)[4] at 15 points; counsel did not mention OV 6 (offender's intent to kill or injure another individual),[5] for which 10 points were assessed. Counsel did challenge the scoring of OV 9 (number of victims)[6] and OV 10 (exploitation of a vulnerable victim),[7] but both only on the ground that the facts of the case did not support the number of points assessed by a preponderance of the evidence. The trial court felt otherwise and kept the score of both variables at 10 points.

---

[2] Our order granting leave to appeal did not limit our consideration of the issues presented to the *Alleyne* question. *People v Lockridge*, 496 Mich 852 (2014). With respect to the defendant's other argument that the trial court did not present sufficient substantial and compelling reasons to depart from the sentencing guidelines, we agree with the Court of Appeals that the reasons articulated by the trial court adequately justified the minimal (10-month) departure above the top of the guidelines minimum sentence range.

[3] MCL 777.33(1)(c).

[4] MCL 777.35(1)(a).

[5] MCL 777.36(1)(c).

[6] MCL 777.39(1)(c).

[7] MCL 777.40(1)(b).

With his prior record variable score of 35 points, the defendant's resulting guidelines minimum sentence range was 43 to 86 months,[8] but the trial court exceeded the guidelines and imposed a minimum sentence of 8 years (96 months) and a maximum sentence of 15 years (180 months, the statutory maximum).[9] As substantial and compelling reasons justifying the departure, the trial court cited that defendant had violated probation orders that forbade him from being where he was when he killed his wife, that he killed his wife in front of their three children as they struggled to stop him from doing so, and that he left the children at home with their mother dead on the floor without concern for their physical or emotional well-being, which were not factors already accounted for in scoring the guidelines. Furthermore, the court said, the extent of the defendant's prior domestic violence was not considered in the guidelines.

The defendant appealed by right in the Court of Appeals, challenging the scoring of the guidelines and the trial court's decision to exceed the guidelines minimum sentence range. While this case was pending in the Court of Appeals, the United States Supreme Court decided *Alleyne*, and defense counsel moved to file a supplemental brief challenging the scoring of the guidelines on *Alleyne* grounds. The Court of Appeals granted that motion. In a published opinion, the Court of Appeals affirmed the defendant's sentence and rejected his *Alleyne* challenge to the scoring of guidelines, adhering to its recent decision in *People v Herron*, 303 Mich App 392; 845 NW2d 533

---

[8] MCL 777.16p; MCL 777.64.

[9] MCL 750.321.

4

(2013), which had rejected that same argument.[10]  *People v Lockridge*, 304 Mich App 278, 284; 849 NW2d 388 (2014) (opinion by O'CONNELL, J.).  Judge BECKERING and Judge SHAPIRO filed concurring opinions agreeing with Judge O'CONNELL's lead opinion that the panel was bound by *Herron*, but disagreeing with the outcome reached in *Herron*.  If not bound by *Herron*, Judge BECKERING would have held that requiring judicial fact-finding to set the guidelines mandatory minimum sentence range violated *Alleyne*.  *Id*. at 285 (opinion by BECKERING, P.J.).  She would have made the guidelines advisory to cure the constitutional problem.  *Id*. at 286.  Judge SHAPIRO would have held that *Alleyne* only bars requiring judicial fact-finding to set the *bottom* of the minimum sentence range, so only the bottom of the range need be made advisory to cure the constitutional flaw.  *Id*. at 311, 315-316 (opinion by SHAPIRO, J.)

The defendant filed an application for leave to appeal in this Court.  We granted leave to appeal to address the significant constitutional question presented.[11]  *People v Lockridge*, 496 Mich 852 (2014).

---

[10] The defendant in *Herron* subsequently filed an application for leave to appeal in this Court, and that application is being held in abeyance pending the outcome of this case. *People v Herron*, 846 NW2d 924 (Mich, 2014).

[11] Our grant order specifically directed the parties to address

> (1) whether a judge's determination of the appropriate sentencing guidelines range, MCL 777.1, *et seq*., establishes a "mandatory minimum sentence," such that the facts used to score the offense variables must be admitted by the defendant or established beyond a reasonable doubt to the trier of fact, *Alleyne v United States*, 570 US ___; 133 S Ct 2151; 186 L Ed 2d 314 (2013); and (2) whether the fact that a judge may depart downward from the sentencing guidelines range for "substantial and compelling" reasons, MCL 769.34(3), prevents the sentencing guidelines from being a

5

## II. LEGAL BACKGROUND

The Sixth Amendment of the United States Constitution provides:

> In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law, and to be informed of the nature and cause of the accusation . . . . [US Const, Am VI.]

The right to a jury trial is a fundamental one, with a long history that dates back to the founding of this country and beyond. *Duncan v Louisiana*, 391 US 145, 148-154; 88 S Ct 1444; 20 L Ed 2d 491 (1968) (discussing the fundamental nature of the right and its long history).

The question presented in this case relates specifically to whether the procedure involved in setting a mandatory sentence infringes a defendant's Sixth Amendment right to a jury trial. One key to this inquiry is whether the pertinent facts that must be found are an element of the offense or a mere sentencing factor. See, e.g., *Jones v United States*, 526 US 227, 232; 119 S Ct 1215; 143 L Ed 2d 311 (1999) ("Much turns on the determination that a fact is an element of an offense rather than a sentencing consideration, given that elements must be charged in the indictment, submitted to a jury, and proven by the Government beyond a reasonable doubt."). The first United States Supreme Court case warranting specific mention here is *McMillan v Pennsylvania*, 477 US 79; 106 S Ct 2411; 91 L Ed 2d 67 (1986).

---

"mandatory minimum" under *Alleyne*, see *United States v Booker*, 543 US 220; 125 S Ct 738; 160 L Ed 2d 621 (2005).

In *McMillan*, the Supreme Court held that the visible possession of a firearm, which the Pennsylvania statute at issue used as a fact increasing the defendant's mandatory sentence, did not constitute an element of the crimes enumerated in its mandatory sentencing statute. Rather, it "instead is a sentencing factor that comes into play only after the defendant has been found guilty of one of those crimes beyond a reasonable doubt." *Id.* at 86. Accordingly, the *McMillan* Court rejected the defendant's argument that Pennsylvania's mandatory minimum sentencing act was unconstitutional.

Things began to change dramatically with *Jones*, however. In that case, the Court held that the fact of whether a victim suffered serious bodily injury, which authorized an increase in the defendant's sentence from 15 to 25 years, was an element of a federal statute prohibiting carjacking or aiding and abetting carjacking that must be found by a jury. Although *Jones* was decided on statutory rather than constitutional grounds, the Court concluded that treating the fact of bodily injury as a mere sentencing factor "would raise serious constitutional questions." *Jones*, 526 US at 251. Justices Stevens and Scalia wrote concurring opinions in *Jones* that presaged the constitutional rule that would be established a year later in *Apprendi*. *Id.* at 252-253 (Stevens, J., concurring); *id.* at 253 (Scalia, J., concurring).

In *Apprendi*, the United States Supreme Court announced the general Sixth Amendment principle at issue in this case: "Other than the fact of a prior conviction, *any fact that increases the penalty for a crime* beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." *Apprendi*, 530 US

7

at 490 (emphasis added).[12] The Court struck down as unconstitutional a statute that provided for a possible increase in the maximum term of imprisonment from 10 to 20 years if the trial court found, by a preponderance of the evidence, that the defendant "acted with a purpose to intimidate an individual or group of individuals because of race, color, gender, handicap, religion, sexual orientation or ethnicity." *Id*. at 469, quoting NJ Stat Ann 2C:44-3(e). The Supreme Court rejected the lower courts' conclusions that the statute was constitutional because the finding of intent to intimidate was a mere "sentencing factor" under *McMillan*. *Id*. at 492.

In *Harris v United States*, 536 US 545, 550; 122 S Ct 2406; 153 L Ed 2d 524 (2002), overruled by *Alleyne*, the Supreme Court was squarely presented with the question "whether *McMillan* stands after *Apprendi*." A majority held that the *Apprendi* rule did not bar judicially found facts altering "mandatory minimum" sentences. But notably, only a plurality of the Court joined the portion of Justice Kennedy's opinion that distinguished *Apprendi* from *McMillan*. *Id*. at 556-568. In his concurring opinion, Justice Breyer wrote that he could not "easily distinguish *Apprendi* . . . from this case in terms of logic," but he joined the Court's judgment only because he could not "yet accept [*Apprendi*'s] rule." *Id*. at 569-570 (Breyer, J., concurring in part). The dissenting opinion took notice, observing that "[t]his leaves only a minority of the Court embracing the distinction between *McMillan* and *Apprendi* that forms the basis of today's holding . . . ." *Id*. at 583 (Thomas, J., dissenting).

---

[12] The Court had previously recognized an "exceptional departure" from this historical practice in *Almendarez-Torres v United States*, 523 US 224; 118 S Ct 1219; 140 L Ed 2d 350 (1998), for the existence of a prior conviction. *Apprendi*, 530 US at 487-488.

8

Next came *Blakely v Washington*, 542 US 296; 124 S Ct 2531; 159 L Ed 2d 403 (2004). In that case, the Supreme Court addressed a challenge to the state of Washington's "determinate" sentencing scheme and observed that "indeterminate sentencing" does not infringe on the power of a jury. *Id*. at 308. Ultimately, the *Blakely* Court held the Washington scheme unconstitutional to the extent that it allowed the trial court to impose a sentence greater than the "statutory maximum" sentence authorized by the jury verdict on the basis of the court's finding that the defendant had acted with "deliberate cruelty." *Id*. at 303-304. The Court again emphasized that "the 'statutory maximum' for *Apprendi* purposes is the maximum sentence a judge may impose *solely on the basis of the facts reflected in the jury verdict or admitted by the defendant*." *Id*. at 303.

In *Booker*, the Supreme Court addressed the application of *Apprendi* to a "determinate" sentencing scheme similar to Washington's, the federal sentencing guidelines. Two different majorities of the Court held that the guidelines were unconstitutional under *Apprendi* and *Blakely*, *Booker*, 542 US at 226 (opinion by Stevens, J.), and that the proper remedy for the constitutional infirmity was to make the guidelines advisory rather than mandatory, *id*. at 245 (opinion by Breyer, J.).

The ripple effects of *Apprendi*, *Blakely*, and *Booker* have been significant in both state and federal courts. See, e.g., *Duncan v United States*, 552 F3d 442, 445 (CA 6, 2009) (referring to the "*Apprendi* revolution"). The changes in the law wrought by this new rule led this Court to address whether Michigan's sentencing guidelines were susceptible to a Sixth Amendment constitutional violation, first in a footnote in *People v Claypool*, 470 Mich 715, 730 n 14; 684 NW2d 278 (2004), and later at greater length in

9

*People v Drohan*, 475 Mich 140, 146; 715 NW2d 778 (2006). In both *Claypool* and *Drohan*, this Court concluded that the *Apprendi*/*Blakely* rule did not apply to Michigan's sentencing scheme at all. This Court reached this conclusion on the basis of its determination that the *Apprendi*/*Blakely* rule was inapplicable to our "indeterminate" scheme. We reasoned in part that "the trial court's power to impose a sentence is always derived from the jury's verdict" because the jury's verdict authorized the "statutory maximum" sentence set by statute. *Drohan*, 475 Mich at 161-162.

In *Alleyne*, the Supreme Court overruled *Harris* and for the first time concluded that mandatory minimum sentences were equally subject to the *Apprendi* rule, holding that "a fact increasing *either end of the range* produces a new penalty and constitutes an ingredient of the offense." *Alleyne*, 570 US at ___; 133 S Ct at 2160 (emphasis added). *Alleyne*, like *Harris*, involved a statute that provided for a mandatory minimum sentence of five years, but that mandatory minimum increased to seven years if it was determined that the defendant had "brandished" a firearm. The Court concluded that there was "no basis in principle or logic to distinguish facts that raise the maximum from those that increase the minimum," *id*. at 2163, but noted that its holding did not restrict fact-finding used to guide judicial discretion in selecting a punishment within the limits fixed by law, *id*. Justice Breyer concurred separately, explaining that while he "continue[d] to disagree with *Apprendi*," he nevertheless believed that it was "highly anomalous to read *Apprendi* as insisting that juries find sentencing facts that *permit* a judge to impose a higher sentence while not insisting that juries find sentencing facts that *require* a judge to impose a higher sentence." *Id*. at 2166-2167 (Breyer, J., concurring).

## III. ANALYSIS

A Sixth Amendment challenge presents a question of constitutional law that this Court reviews de novo. *Drohan*, 475 Mich at 146.

The defendant argues that because *Alleyne* extended the *Apprendi* rule from statutory maximum sentences to mandatory minimum sentences, Michigan's sentencing guidelines are no longer immune from that rule. We agree. From *Apprendi* and its progeny, including *Alleyne*, we believe the following test provides the proper inquiry for whether a scheme of mandatory minimum sentencing violates the Sixth Amendment: Does that scheme constrain the discretion of the sentencing court by compelling an increase in the mandatory minimum sentence beyond that authorized by the jury's verdict alone? Michigan's sentencing guidelines do so to the extent that the floor of the guidelines range compels a trial judge to impose a mandatory minimum sentence beyond that authorized by the jury verdict. Stated differently, to the extent that OVs scored on the basis of facts not admitted by the defendant or necessarily found by the jury verdict increase the floor of the guidelines range, i.e. the defendant's "mandatory minimum" sentence, that procedure violates the Sixth Amendment.

The pertinent language in *Alleyne* supports this conclusion. "Elevating the low-end of a sentencing range heightens the loss of liberty associated with the crime: the defendant's 'expected punishment has increased as a result of the narrowed range' and 'the prosecution is empowered, by invoking the mandatory minimum, to require the judge to impose a higher punishment than he might wish.' " *Alleyne*, 570 US at ___; 133 S Ct at 2161, quoting *Apprendi*, 530 US at 522 (Thomas, J., concurring). Similarly, by virtue of the fully scored sentencing guidelines, a judge is required to "impose a higher

11

punishment than he might wish." Just as the judge's finding that there was "brandishing" in *Alleyne* aggravated the penalty in that case by increasing the floor of the range prescribed by law,[13] the OV scoring judges must do as part of our system increases the bottom of the mandatory guidelines range used to set the minimum sentence.

In criticizing the *Alleyne* majority's extension of the *Apprendi* rule, Chief Justice Roberts's dissenting opinion also had language supporting this conclusion. He wrote:

> Under the rule in place until today, *a legislature could tell judges that certain facts carried certain weight, and require the judge to devise a sentence based on that weight—so long as the sentence remained within the range authorized by the jury.* Now, in the name of the jury right that formed a barrier between the defendant and the State, the majority has erected a barrier between judges and legislatures, establishing that discretionary sentencing is the domain of judges. Legislatures must keep their respectful distance. [*Alleyne*, 570 US at ___; 133 S Ct at 2170-2171 (Roberts, C.J., dissenting) (emphasis added).]

In other words, unrestrained judicial discretion within a broad range is in; legislative constraints on that discretion that increase a sentence (whether minimum or maximum) beyond that authorized by the jury's verdict are out.

In *Herron*, the Court of Appeals found no constitutional flaw in our sentencing guidelines, reasoning in part that judicial fact-finding in our guidelines scheme is permissible because it is used only to "inform the trial court's sentencing discretion within the maximum determined by statute and the jury's verdict." *Herron*, 303 Mich App at 403.[14] We reject this analysis because it ignores two key aspects of the *Apprendi*

---

[13] *Alleyne*, 570 US at ___; 133 S Ct at 2160, 2163.

[14] To the extent that the *Herron* panel's analysis rested on its determination that the sentencing guidelines do not establish a "mandatory minimum" sentence, we reject it for the reasons discussed in Part III(C) of this opinion.

rule as extended by *Alleyne*: (1) the fact-finding is used to *constrain*, not merely inform, the court's sentencing discretion by increasing the mandatory minimum sentence and (2) because *Alleyne* now prohibits increasing the *minimum* as well as the maximum sentence in this manner, it is insufficient to say that the guidelines scheme is constitutional because the *maximum* is set by statute and authorized by the jury's verdict.

Consider this example: a defendant with no prior record who is convicted of kidnapping, MCL 750.349, a Class A offense, MCL 777.16q, which carries a statutory maximum sentence of life in prison. Assume further that no facts necessary to score any of the OVs are admitted by the defendant or necessarily found by the jury as part of the verdict. Under our sentencing guidelines, that defendant would be subject to a minimum sentence of no less than 21 months (the bottom of the applicable guidelines range)[15] and a maximum sentence of life (the statutory maximum).[16] If this were the end of the road and the trial court were free to sentence the defendant anywhere within this range, we would agree that no Sixth Amendment impediment exists.

But there is more. MCL 777.21(1)(a) and MCL 777.22(1) direct courts to score OVs 1 through 4, 7 through 14, 19 and 20 for crimes against a person, a designation that applies to kidnapping, MCL 777.16q. Under this hypothetical situation, a trial court could find facts not found by a jury or admitted by the defendant that could potentially increase the floor of the defendant's minimum sentence from 21 months to as much as

---

[15] MCL 777.62. Because the top of the guidelines range does not implicate the Sixth Amendment, it is not relevant to this hypothetical and we therefore do not discuss it.

[16] MCL 750.349.

13

108 months. MCL 777.62. Those facts are "fact[s] increasing either end of the range" of penalties to which a defendant is exposed, *Alleyne*, 570 US at ___; 133 S Ct at 2160, and therefore the process violates the Sixth Amendment.

The example provided by the *Blakely* Court of what differentiated a constitutionally permissible "indeterminate" sentencing scheme from an impermissible one, which the *Drohan* Court quoted and the dissent here also quotes, further illustrates this point:

> In a system that says the judge may punish burglary with 10 to 40 years, every burglar knows he is risking 40 years in jail. In a system that punishes burglary with a 10-year sentence, with another 30 added for use of a gun, the burglar who enters a home unarmed is *entitled* to no more than a 10-year sentence—and by reason of the Sixth Amendment the facts bearing upon that entitlement must be found by a jury. [*Blakely*, 542 US at 309.]

Michigan's sentencing scheme is not like the first example, in which a court has unfettered discretion to impose a sentence within a range authorized by the jury's verdict. Rather, it is more akin to the latter example. Guidelines scored solely on a defendant's admissions and prior convictions set a baseline minimum sentence (i.e. 10 years in the *Blakely* example or 21 months in our hypothetical example), with additional time added by aggravating factors (such as possession or use of a gun, as in the *Blakely* example): the OVs, which are generally scored on the basis of facts found by the court rather than a jury. The sentencing court's authority to score the OVs is constrained by law.[17] A

---

[17] See, e.g., MCL 777.31(1) (directing that the OV be scored by "determining which of the following [circumstances] apply and by assigning the number of points attributable to the one that has the highest number of points"); *People v Houston*, 473 Mich 399, 407; 702 NW2d 530 (2005).

14

defendant's possible minimum sentence is increased as a result of that scoring, and the court is constrained to impose a minimum sentence in conformity with the applicable guidelines range that is increased by the scoring of those OVs. Thus, Michigan does indeed have a system that punishes an offense with a baseline minimum sentence of no less than X months, with the potential for Y months to be added for the use of a gun, Z months to be added for killing a victim, and so forth. This reality could be ignored when *Drohan* was decided because the *Apprendi* rule applied only to "statutory maximums" and scoring the sentencing guidelines and establishing the guidelines minimum sentence range does not alter the maximum sentence. But that analysis is no longer sustainable in light of *Alleyne*'s extension of the *Apprendi* rule to minimum sentences.

In *Drohan*, this Court analyzed the evolution of the *Apprendi* rule and concluded that the "statutory maximum" sentence in Michigan for *Apprendi*/*Blakely* purposes is generally the maximum sentence set by the statute setting forth the elements of the offense at issue. *Drohan*, 475 Mich at 164. Accordingly, because at that time the *Apprendi* rule only applied to *maximum* sentences, not minimums, and judicial fact-finding to set the guidelines range only affected *minimum* sentences, we held that Michigan's sentencing guidelines scheme did not violate the Sixth Amendment. On this point, *Drohan* necessarily relied on *Harris*'s holding that the *Apprendi* rule did not apply to minimum sentences. *Harris*, 536 US at 568.

*Alleyne* changed that. In *Alleyne*, the United States Supreme Court overruled *Harris* and held for the first time that the *Apprendi* rule applied with equal force to minimum sentences. *Alleyne*, 570 US at ___; 133 S Ct at 2155. With minimum sentences now also relevant to the Sixth Amendment analysis, the statutory authority of

15

the court *can* infringe the constitutional authority of the jury because the guidelines used to set the minimum sentence require a court to increase a defendant's minimum sentence beyond the minimum sentence authorized by the jury's verdict alone. To the extent that *Drohan* asserted that our sentencing scheme is constitutional because the jury verdict always authorizes the maximum sentence provided by law, that analysis is no longer sufficient to complete the constitutional analysis in light of *Alleyne*; rather, under *Alleyne*, the Legislature may not require judicial fact-finding that results in a mandatory increase in *either* the minimum or maximum sentence beyond the range set by the jury verdict.

Therefore, a straightforward application of the language and holding in *Alleyne* leads to the conclusion that Michigan's sentencing guidelines scheme violates the Sixth Amendment. The prosecution and amici curiae do not dispute the holding in *Alleyne*, but instead advance three arguments in an attempt to sidestep it. First, it is asserted that just as we concluded in *Drohan*, the *Apprendi* rule (as now extended by *Alleyne*) does not apply to Michigan's sentencing scheme because that scheme is "indeterminate." Second, Michigan's sentencing guidelines do not violate the Sixth Amendment because the minimum sentences they set merely establish a parole eligibility date rather than an absolute prison release date and there is no constitutional right to parole. Third, the minimum sentence set by the sentencing guidelines is not a "mandatory minimum" sentence for purposes of *Alleyne*. For the reasons that follow, we reject each of these arguments.

## A. MICHIGAN'S "INDETERMINATE" SENTENCING SCHEME

The prosecution and the dissent rely primarily on their conclusion that the *Apprendi* rule does not apply to "indeterminate" sentencing schemes like Michigan's to dismiss the defendant's constitutional claim. It is certainly correct that the United States Supreme Court has repeatedly distinguished between "determinate" and "indeterminate" sentencing systems and referred to the latter as not implicating Sixth Amendment concerns and that *Alleyne* did nothing to alter or undermine that distinction. Because we are bound by the United States Supreme Court's decisions interpreting the Sixth Amendment such as *Apprendi* and *Alleyne*, however, it is critical to understand exactly what those terms mean in that context rather than in the abstract. And significantly, Michigan's sentencing scheme is not "indeterminate" as the United States Supreme Court has ever applied that term.[18]

In *Blakely*, in responding to the dissent, the majority stated, without defining its terms, that "indeterminate" sentencing schemes would not violate the *Apprendi* rule. In quoted language relied on heavily by the prosecution and the dissent in this case, the Court asserted:

> By reversing the judgment below, we are not, as the State would have it, "find[ing] determinate sentencing schemes unconstitutional." This case is not about whether determinate sentencing is constitutional, only about how it can be implemented in a way that respects the Sixth Amendment. . . .

---

[18] In *Drohan*, we cited the definition of "indeterminate sentence" from *Black's Law Dictionary* (8th ed): a sentence "of an unspecified duration, such as one for a term of 10 to 20 years." *Drohan*, 475 Mich at 153 n 10. *Drohan* was correct to say that Michigan has an indeterminate sentencing scheme under that definition of the term.

17

JUSTICE O'CONNOR argues that, because determinate-sentencing schemes involving judicial fact-finding entail less judicial discretion than indeterminate schemes, the constitutionality of the latter implies the constitutionality of the former. This argument is flawed on a number of levels. First, the Sixth Amendment by its terms is not a limitation on judicial power, but a reservation of jury power. It limits judicial power only to the extent that the claimed judicial power infringes on the province of the jury. *Indeterminate sentencing does not do so.* It increases judicial discretion, to be sure, but not at the expense of the jury's traditional function of finding the facts essential to lawful imposition of the penalty. Of course indeterminate schemes involve judicial fact-finding, in that a judge (like a parole board) may implicitly rule on those facts he deems important to the exercise of his sentencing discretion. But the facts do not pertain to whether the defendant has *a legal right to a lesser sentence*—and that makes all the difference insofar as judicial impingement upon the traditional role of the jury is concerned. [*Blakely*, 542 US at 308-309 (citations omitted) (emphasis added).]

The *Blakely* dissent, however, identified states with both indeterminate and determinate (as *Drohan* understood those terms) sentencing schemes as ones that *Blakely* cast "constitutional doubt" over because they had "guidelines systems." *Id*. at 323 (O'Connor, J., dissenting). Michigan was among the states listed. *Id*. Legal commentators have also noted that the United States Supreme Court has never referred to Michigan's sentencing scheme as "indeterminate" for constitutional purposes and that Justice O'Connor's *Blakely* dissent suggested the opposite; rather, the Court's focus in discussing "indeterminate" schemes has been on the absence of mandatory constraints placed on a court's discretion when sentencing a defendant within a range of possible sentences. See Hall, *Mandatory Sentencing Guidelines by Any Other Name: When "Indeterminate Structured Sentencing" Violates* Blakely v Washington, 57 Drake L Rev 643, 669 & n 139 (2009) (hereinafter, *Mandatory Sentencing Guidelines*) (stating that "in *Blakely*, the Supreme Court understood an indeterminate sentencing regime to be one in

18

which the sentencing judge enjoys 'unfettered discretion' within statutory and constitutional limits, and that a mandatory sentencing guidelines system, *even when used in conjunction with a parole board*, is fundamentally inconsistent with this definition of indeterminate sentencing") (emphasis added); Ball, *Heinous, Atrocious, and Cruel: Apprendi, Indeterminate Sentencing, and the Meaning of Punishment*, 109 Colum L Rev 893, 907 (2009) (observing that the United States Supreme Court has used " 'indeterminate' to mean 'advisory' and 'determinate' to mean 'binding' (i.e., determinative of the outcome)"); see also *Cunningham v California*, 549 US 270, 291-292 ; 127 S Ct 856; 166 L Ed 2d 856 (2007) ("Merely advisory provisions, recommending but not requiring the selection of particular sentences in response to differing sets of facts . . . would not implicate the Sixth Amendment."), quoting *Booker*, 543 US at 233 (quotation marks omitted); *Alleyne*, 133 S Ct at 2165 (Sotomayor, J., concurring) (observing that the United States Supreme Court has "applied *Apprendi* to strike down *mandatory sentencing systems* at the state and federal levels") (emphasis added).[19]  At least one other court has also recognized that the United States Supreme

---

[19] The United States Supreme Court cases that refer to "indeterminate sentencing" and then immediately stress the exercise of vast judicial discretion within broad sentencing ranges as the centerpiece of such a system are too numerous to cite here.  For but a few additional examples, see *Almendarez-Torres*, 523 US at 245-246 (discussing how judges "have typically exercised their discretion within broad statutory ranges" and then citing a source discussing the "history of indeterminate sentencing"); *Mistretta v United States*, 488 US 361, 363; 109 S Ct 647; 102 L Ed 2d 714 (1989) (discussing the federal government's longstanding practice of indeterminate sentencing as one in which "[s]tatutes specified the penalties for crimes but nearly always gave the sentencing judge wide discretion to decide whether the offender should be incarcerated and for how long"); *Jones*, 526 US at 271 (Kennedy, J., dissenting) (contrasting "a system of indeterminate sentencing *or a grant of vast discretion to the trial judge*" and "a regime in which there are more uniform penalties, prescribed by the legislature") (emphasis added).

Court has used the term "indeterminate" "imprecisely." *Commonwealth v Yuhasz*, 592 Pa 120, 133 n 4; 923 A2d 1111 (2007).[20] And at no time has the Supreme Court specifically defined its use of the term or defined it by reference to *Black's Law Dictionary*.

Accordingly, the relevant distinction between constitutionally permissible "indeterminate" sentencing schemes and impermissible "determinate" sentencing schemes, as the United States Supreme Court has used those terms, turns not on whether the sentences produced by them contain one or two numbers;[21] rather, it turns on whether judge-found facts are used to curtail judicial sentencing discretion by *compelling* an increase in the defendant's punishment. If so, the system violates the Sixth Amendment. Michigan's sentencing guidelines do just that.

Because Michigan's sentencing scheme is not "indeterminate" as that term has been used by the United States Supreme Court, our sentencing guidelines scheme cannot be exempt from the *Apprendi* and *Alleyne* rule on that basis. And the escape hatch that *Harris* provided for *Drohan*—that *Apprendi* applied only to maximum sentences and the

---

To the extent that the dissent criticizes our analysis on this point as "entirely speculative," and unsupported by binding authority, it simply ignores this footnote and cases cited in the accompanying text.

[20] Crucially, the *Yuhasz* Court cited this imprecision as a reason to hold that the fact that its guidelines scheme is advisory, not its indeterminate nature, made the scheme constitutionally sound.

[21] Indeed, to reach that conclusion would be to ignore *Alleyne*'s clear acknowledgment that there could be *two* constitutionally significant sentences: a mandatory minimum and a statutory maximum. That only one number might exist in a given case seems of little relevance to the analysis.

statutory maximums in Michigan are set by law and therefore never increased based on judge-found facts—has been sealed by *Alleyne*.

## B. NO CONSTITUTIONAL RIGHT TO PAROLE

In a permutation of its "indeterminate" sentencing argument, the dissent also contends that Michigan's sentencing scheme does not violate *Alleyne* because a defendant's minimum sentence merely determines when that defendant is eligible for parole consideration and there is no constitutional entitlement to parole. This argument was not raised by the prosecution, but was advanced instead by the Attorney General in an amicus curiae brief. We have no quarrel with the general proposition that a defendant has no constitutional entitlement to be paroled, as that proposition is well established by *Greenholtz v Inmates of Nebraska Penal & Correctional Complex*, 442 US 1, 7; 99 S Ct 2100; 60 L Ed 2d 668 (1979), but we do not see its relevance here. The right at issue includes the Sixth Amendment right to a jury trial, not just the due-process right to be free of deprivation of one's liberty that was at issue in *Greenholtz*.[22] And that right includes the right to have a "jury determination" of all the pertinent facts used in *increasing the prescribed range of penalties, including both the minimum and the maximum sentences*. The violation of *that* right occurs well before a defendant even begins serving that sentence. *Alleyne*, 570 US at ___; 133 S Ct at 2160 (noting that "a

---

[22] We do not dispute the dissent's correct contention that *Apprendi* and *Alleyne* stated that they implicate both the Sixth Amendment right to a jury trial and the Fourteenth Amendment right to due process. *Post* at 38 n 25. But it is for the very reason that *both* of these rights are implicated that *Greenholtz* and other cases involving only the latter necessarily cannot answer the question before us. Rather, it is *Apprendi* and *Alleyne*, cases that implicate *both* rights, that are "highly relevant to the analysis."

fact increasing either end of the range produces *a new penalty* and constitutes an ingredient of the offense" that must be found by a jury).  The failure to have the jury find an element establishing "a distinct and aggravated crime," *id*. at ___; 133 S Ct at 2163, not the resulting sentence, is the constitutional deficiency, *id*. at ___; 133 S Ct at 2162 (observing that "if a judge were to find a fact that increased the statutory maximum sentence, such a finding would violate the Sixth Amendment, *even if the defendant ultimately received a sentence falling within the original sentencing range*") (emphasis added).  Accordingly, the assertion that a defendant has no constitutional right to serve less than his or her maximum sentence is entirely correct, but also entirely beside the point.  King & Applebaum, Alleyne *on the Ground: Factfinding That Limits Eligibility for Probation or Parole Release*, 26 Fed Sent Rep 287, 289 (2014) ("The minimum sentence that matters in *Alleyne* is the floor of the *range available to the sentencing judge*, the penalty 'affixed to the crime,' not the sentence that might *actually be served* by the offender.  That a paroling authority may ultimately decide not to release the defendant when he first becomes eligible is irrelevant.").  Neither the dissent nor the Attorney General cites any other case for the novel proposition that application of the *Apprendi* rule hinges on whether a defendant is entitled to immediate release upon completion of the sentence at issue or whether the defendant is simply eligible for release or to be paroled.[23]

---

[23] The dissent briefly cites *Wolff v McDonnell*, 418 US 539; 94 S Ct 2963; 41 L Ed 2d 935 (1974), and *Morrissey v Brewer*, 408 US 471; 92 S Ct 2593; 33 L Ed 2d 484 (1972), but both of those cases involve a criminal defendant's rights in parole proceedings.  Thus, they are as inapposite here as *Greenholtz*.

Finally, it is worth noting that this argument is not supported by other state court decisions applying *Alleyne* to their sentencing schemes. See, e.g., *State v Soto*, 299 Kan 102; 322 P3d 334 (2014) (rejecting as unconstitutional under *Alleyne* a statute that provided for a prison sentence of life with 50 years before the *possibility of parole*). And at bottom, what this argument ignores is that in *Alleyne*, the Supreme Court held that like a maximum sentence, a minimum sentence enhanced by judicial fact-finding also implicates the Sixth Amendment jury-trial protection. It is therefore no answer to say that *Alleyne* is inapplicable here because a defendant has no constitutional right to parole.

C. "MANDATORY MINIMUM" SENTENCES UNDER *ALLEYNE*

The prosecution and the dissent's final basis for concluding that *Alleyne* does not apply to our sentencing guidelines scheme is that the guidelines do not produce "mandatory minimum" sentences for *Alleyne* purposes. We again disagree.

First, this argument seems to assume that *Alleyne* applies only to what one might consider traditional mandatory minimums, statutes that provide that upon conviction of an offense, the court "*shall* sentence the defendant to a term of imprisonment of *not less than*" x number of years. This fails to account for the broad nature of the *Apprendi* rule generally that " 'facts that increase *the prescribed range of penalties* to which a criminal defendant is exposed' " must be established by proof beyond a reasonable doubt. *Apprendi*, 530 US at 490, quoting *Jones*, 526 US at 252-253 (emphasis added). While *Alleyne* applied this rule to a mandatory minimum sentence, and therefore necessarily spent a great deal of time articulating how the mandatory minimum sentence in that case violated *Apprendi*, it also reemphasized that the Sixth Amendment applies to facts used to

23

set the *range* of sentences to which a defendant is exposed. *Alleyne*, 570 US at ___; 133 S Ct at 2160 ("[B]ecause the legally prescribed range *is* the penalty affixed to the crime, . . . it follows that a fact increasing either end of the range produces a new penalty and constitutes an ingredient of the offense."). Thus, *Alleyne* cannot be dismissed as inapplicable simply because the statute at issue in that case looks different from our statutory guidelines scheme or because *Alleyne* only applies to the traditional mandatory minimum sentences mentioned previously. As long as the minimum sentence is "mandatory," i.e. required by law, *Alleyne* applies.

More importantly, the core argument that the guidelines do not produce "mandatory" minimum sentences is itself incorrect. The guidelines minimum sentence range *is* binding on trial courts, absent their articulating substantial and compelling reasons for a departure. The dissent notes that MCL 769.34(4)(a) labels the guidelines ranges as "recommended minimum sentence ranges," but elsewhere the same statute states that "the minimum sentence imposed by a court of this state . . . *shall* be within the appropriate sentence range under the version of those sentencing guidelines in effect on the date the crime was committed." MCL 769.34(2) (emphasis added). As we have stated many times, "shall" indicates a *mandatory* directive. *Fradco, Inc v Dep't of Treasury*, 495 Mich 104, 114; 845 NW2d 81 (2014). This is precisely the analysis the United States Supreme Court engaged in in *Booker*, when it invalidated the federal sentencing guidelines because it concluded they were mandatory. *Booker*, 543 US at 233-234 ("The Guidelines as written, however, are not advisory; they are mandatory and binding on all judges. While subsection (a) of § 3553 of the sentencing statute lists the Sentencing Guidelines as one factor to be considered in imposing a sentence, subsection

24

(b) directs that the court '*shall* impose a sentence of the kind, and within the range' established by the Guidelines, subject to departures in specific, limited cases."). Accordingly, Michigan's guidelines produce sentences that are just as mandatory as those at issue in *Alleyne*.

But, the dissent asserts, the availability of a sentence departure from the guidelines renders them not truly mandatory. This argument must necessarily reject language from *Booker* that specifically stated that the availability of a departure "does not avoid the constitutional issue . . . ." *Id.* at 234; see also *Blakely*, 542 US at 305 n 8 (stating that that a judge "cannot make that judgment [that compelling reasons exist to depart from the guidelines] without finding some facts to support it beyond the bare elements of the offense" and that "[w]hether the judicially determined facts *require* a sentence enhancement or merely *allow* it, the verdict alone does not authorize the sentence"). Much of the dissent's basis for rejecting the *Booker* language, however, hinges on its earlier erroneous conclusion that *Alleyne* does not apply to our "indeterminate" sentencing scheme.[24] To the extent that the dissent's rejection of this language rests on *Drohan*, we see nothing in that opinion to indicate that the *Drohan* Court rejected or even considered this language in reaching its decision. For these reasons, we conclude that Michigan's sentencing guidelines produce a "mandatory minimum" sentence to which *Alleyne* applies.[25]

---

[24] See *post* at 44 ("[A]nything the Supreme Court has said about upward departures in a determinate system cannot reflexively be applied to an indeterminate system.").

[25] The dissent implies that 11 federal courts of appeal have rendered decisions to the contrary. We do not agree. First, to be clear, none of those courts has rendered a decision on whether *Michigan's* sentencing guidelines produce "mandatory minimum"

Because the rule from *Alleyne* applies, the Sixth Amendment does not permit judicial fact-finding to score OVs to increase the floor of the sentencing guidelines range. The right to a jury trial is "a fundamental reservation of power in our constitutional structure," *Blakely*, 542 US at 306, and therefore one that cannot be restricted in this manner.

## IV.  REMEDY

Having concluded that Michigan's sentencing guidelines violate the Sixth Amendment rule from *Apprendi*, as extended by *Alleyne*, we must determine the appropriate remedy for the violation.  We consider three options.

First, the defendant asks us to require juries to find the facts used to score all the OVs that are not admitted or stipulated by the defendant or necessarily found by the jury's verdict.  We reject this option.  The constitutional violation can be effectively remedied without burdening our judicial system in this manner, which could essentially turn sentencing proceedings into mini-trials.  And the United States Supreme Court in *Booker* expressly rejected this remedy because of the profound disruptive effect it would have in every case.  *Booker*, 543 US at 248 ("It would affect decisions about whether to

---

sentences.  Second, to the extent that those courts have held that "judicial fact-finding does not implicate *Alleyne* where there is no 'mandatory minimum' sentence involved," *post* at 46, we agree with them.  But to say that those decisions support the dissent's analysis simply begs the question: Do Michigan's sentencing guidelines produce a "mandatory minimum" sentence?

26

go to trial.  It would affect the content of plea negotiations.  It would alter the judge's role in sentencing.").[26]  We agree.

Second, we consider the remedy suggested in Judge SHAPIRO's concurring opinion in this case, which would render advisory only the floor of the applicable guidelines range.  *Lockridge*, 304 Mich App at 316 (opinion by SHAPIRO, J.).  While we believe that this is a less disruptive remedy that is fairly closely tailored to the constitutional violation, we decline to adopt it because it would require us to significantly rewrite MCL 769.34(2), which provides in part:

> Except as otherwise provided in this subsection or for a departure from the appropriate minimum sentence range provided for under subsection (3), *the minimum sentence imposed by a court of this state for a felony enumerated in* [MCL 777.11 through MCL 777.19] *committed on or after January 1, 1999 shall be within the appropriate sentence range* under the version of those sentencing guidelines in effect on the date the crime was committed.  [Emphasis added.]

The legislative intent in this provision is plain: the Legislature wanted the applicable guidelines minimum sentence range to be mandatory in all cases (other than those in which a departure was appropriate) at both the top and bottom ends.  Opening up only one end of the guidelines range, even if curing the constitutional violation, would be inconsistent with the Legislature's expressed preference for equal treatment.  See *Booker*, 543 US at 248 ("In today's context—a highly complex statute, interrelated provisions,

---

[26] In asserting that in *Alleyne* the "narrow" remedy imposed was "that facts increasing the minimum sentence must be submitted to the jury" and suggesting that we adopt that remedy, the dissent is effectively proposing that we should do just this.  For the reasons given, we do not see this remedy as "narrow" given its potential for disruptive effects, which the dissent does not acknowledge.

27

and a constitutional requirement that creates fundamental change—*we cannot assume that Congress, if faced with the statute's invalidity in key applications, would have preferred to apply the statute in as many other instances as possible*.") (emphasis added). And it would require a significant rewrite of the statutory language to maintain the mandatory nature of the guidelines ceiling but render the guidelines floor advisory only. Accordingly, we decline to limit the remedy for the constitutional infirmity to the floor of the guidelines range.

Third, the prosecution, in turn, asks us to *Booker*-ize the Michigan sentencing guidelines, i.e., render them advisory only. We agree that this is the most appropriate remedy. First, it is the same remedy adopted by the United States Supreme Court in *Booker*.[27] Second, it requires the least judicial rewriting of the statute, as we need only substitute the word "may" for "shall" in MCL 769.34(2) and remove the requirement in MCL 769.34(3) that a trial court that departs from the applicable guidelines range must articulate a substantial and compelling reason for that departure.

Like the Supreme Court in *Booker*, however, we conclude that although the guidelines can no longer be mandatory, they remain a highly relevant consideration in a trial court's exercise of sentencing discretion. Thus, we hold that trial courts "must consult those Guidelines and take them into account when sentencing." *Booker*, 543 US at 264. Such a system, while "not the system [the legislature] enacted, nonetheless

---

[27] Thus, to the extent that the Constitution requires a certain degree of precision to remedy the constitutional violation, adopting the *Booker* remedy most carefully ensures that we remain faithful to its dictates. Accordingly, while it is unfortunate that the dissent finds the reasons for our adoption of this remedy unpersuasive, for this and our other reasons stated we believe it to be the most prudent course under the circumstances.

28

continue[s] to move sentencing in [the legislature's] preferred direction, helping to avoid excessive sentencing disparities while maintaining flexibility sufficient to individualize sentences where necessary." *Id*. at 264-265.

Accordingly, we sever MCL 769.34(2) to the extent that it is mandatory and strike down the requirement of a "substantial and compelling reason" to depart from the guidelines range in MCL 769.34(3). When a defendant's sentence is calculated using a guidelines minimum sentence range in which OVs have been scored on the basis of facts not admitted by the defendant or found beyond a reasonable doubt by the jury,[28] the sentencing court may exercise its discretion to depart from that guidelines range without articulating substantial and compelling reasons for doing so. A sentence that departs from the applicable guidelines range will be reviewed by an appellate court for reasonableness. *Booker*, 543 US at 261. Resentencing will be required when a sentence is determined to be unreasonable. Because sentencing courts will hereafter not be *bound* by the applicable sentencing guidelines range, this remedy cures the Sixth Amendment flaw in our guidelines scheme by removing the unconstitutional constraint on the court's discretion. Sentencing courts must, however, continue to consult the applicable guidelines range and take it into account when imposing a sentence. Further, sentencing courts must justify the sentence imposed in order to facilitate appellate review. *People v*

---

[28] Our holding today does nothing to undercut the requirement that the highest number of points possible *must be* assessed for all OVs, whether using judge-found facts or not. See MCL 777.21(1)(a) (directing that the offense variables applicable to the offense category at issue be scored); see also, e.g., MCL 777.31(1) (directing that the "highest number of points" possible be scored); MCL 777.32(1) (same); etc.

*Coles*, 417 Mich 523, 549; 339 NW2d 440 (1983), overruled in part on other grounds by *People v Milbourn*, 435 Mich 630, 644; 461 NW2d 1 (1990).

## V. APPLICATION TO THIS DEFENDANT

The defendant did not object to the scoring of the OVs at sentencing on *Apprendi/Alleyne* grounds, so our review is for plain error affecting substantial rights. *Carines*, 460 Mich at 763, 774.[29] To establish entitlement to relief under plain-error review, the defendant must establish that an error occurred, that the error was plain, i.e., clear or obvious, and that the plain error affected substantial rights. *Id*. at 763. The third requirement generally requires a showing of prejudice, i.e., that the error affected the outcome of the lower court proceedings. *Id*. Finally, even if a defendant satisfies those three requirements, an appellate court must exercise its discretion in deciding whether to reverse. *Id*. Reversal is warranted only when the error resulted in the conviction of an actually innocent defendant or seriously affected the fairness, integrity, or public reputation of judicial proceedings independently of the defendant's innocence. *Id*. at 763-764.

The defendant received a total of 70 OV points and had 35 points assessed for prior record variables, placing him in the D-V cell of the sentencing grid for Class C offenses. MCL 777.64. That cell calls for a minimum sentence of 43 to 86 months. The

---

[29] The United States Supreme Court has applied plain-error review to unpreserved *Apprendi* errors. See *United States v Cotton*, 535 US 625; 122 S Ct 1781; 152 L Ed 2d 860 (2002). It has also held that *Apprendi* errors are not structural errors, *Washington v Recuenco*, 548 US 212; 126 S Ct 2546; 165 L Ed 2d 466 (2006), so to the extent that "our caselaw suggests that a plain structural error satisfies the third *Carines* prong," *People v Vaughn*, 491 Mich 642, 666; 821 NW2d 288 (2012), it is not implicated here.

defendant concedes that the jury verdict necessarily established the factual basis to assess 25 points for OV 3 and 10 points for OV 6.  Assuming arguendo that the facts necessary to score OV 5 at 15 points and OV 9 and OV 10 at 10 points each were not established by the jury's verdict or admitted by the defendant, and yet those facts were used to increase the defendant's mandatory minimum sentence, violating the Sixth Amendment,[30] the defendant nevertheless is not entitled to resentencing.  Because he received an upward departure sentence that did not rely on the minimum sentence range from the improperly scored guidelines (and indeed, the trial court necessarily had to state on the record its reasons for *departing* from that range), the defendant cannot show prejudice from any error in scoring the OVs in violation of *Alleyne*.  See note 31 of this opinion.

## VI.  APPLICATION TO OTHER DEFENDANTS

Although we have held that the defendant in this case cannot satisfy the plain-error standard, we nevertheless must clarify how that standard is to be applied in the many

---

[30] For the reasons explained in Part III(B) of this opinion, the right at issue is a procedural one, i.e. the right to have a "jury determination" of all the pertinent facts used in increasing the prescribed range of penalties, including both the minimum and the maximum sentence.  Thus, a constitutional error occurs regardless of whether the error has a substantive effect on the defendant's sentence.  *Alleyne* makes this plain.  *Alleyne*, 570 US at ___; 133 S Ct at 2162-2163 ("[I]f a judge were to find a fact that increased the statutory maximum sentence, such a finding would violate the Sixth Amendment, *even if the defendant ultimately received a sentence falling within the original sentencing range* (*i.e.,* the range applicable without that aggravating fact). . . .  The essential point is that the aggravating fact produced a higher range . . . .  [T]here is no basis in principle or logic to distinguish facts that raise the maximum from those that increase the minimum.") (emphasis added).

Thus, whether that error *actually* increases the floor of a defendant's minimum sentence range under the guidelines is only relevant to the question of whether the defendant has suffered any prejudice.

cases that have been held in abeyance for this one. This analysis is particularly important because, given the recent origin of *Alleyne*, virtually all of those cases involve challenges that were not preserved in the trial court.

First, we consider cases in which (1) facts admitted by the defendant and (2) facts found by the jury were sufficient to assess the minimum number of OV points necessary for the defendant's score to fall in the cell of the sentencing grid under which he or she was sentenced. In those cases, because the defendant suffered no prejudice from any error, there is no plain error and no further inquiry is required.

Second, we consider the converse: cases in which facts admitted by a defendant or found by the jury verdict were *insufficient* to assess the minimum number of OV points necessary for the defendant's score to fall in the cell of the sentencing grid under which he or she was sentenced. In those cases, it is clear from our previous analysis that an unconstitutional constraint actually impaired the defendant's Sixth Amendment right. The question then turns to which of these defendants is entitled to relief, i.e. which can show plain error.

We conclude that all defendants (1) who can demonstrate that their guidelines minimum sentence range was actually constrained by the violation of the Sixth Amendment and (2) whose sentences were not subject to an upward departure[31] can

---

[31] In cases such as this one that involve a minimum sentence that is an upward departure, a defendant necessarily cannot show plain error because the sentencing court has already clearly exercised its discretion to impose a *harsher* sentence than allowed by the guidelines and expressed its reasons for doing so on the record. It defies logic that the court in those circumstances would impose a lesser sentence had it been aware that the guidelines were merely advisory. Thus, we conclude that as a matter of law, a defendant

establish a threshold showing of the potential for plain error sufficient to warrant a remand to the trial court for further inquiry. We reach this conclusion in part on the basis of our agreement with the following analysis from *United States v Crosby*, 397 F3d 103, 117-118 (CA 2, 2005):

> Some might suppose that the only choice for an appellate court in a case presenting a procedural error in imposing a sentence is between disregarding the error and requiring a new sentencing. However, the choice is not so limited. . . . . Bearing in mind the several considerations outlined above that shape the context in which a disposition decision is to be made, we conclude that the "further sentencing proceedings" generally appropriate for pre-*Booker/Fanfan*[32] sentences pending on direct review will be a remand to the district court, not for the purpose of a required resentencing, but only *for the more limited purpose of permitting the sentencing judge to determine whether to resentence, now fully informed of the new sentencing regime, and if so, to resentence.* . . .
>
> A remand for determination of *whether* to resentence is appropriate in order to undertake a proper application of the plain error and harmless error doctrines. Without knowing whether a sentencing judge would have imposed a materially different sentence, . . . an appellate court will normally be unable to assess the significance of any error that might have been made. . . .
>
> Obviously, any of the errors in the procedure for selecting the original sentence discussed in this opinion would be harmless, and not prejudicial under plain error analysis, if the judge decides on remand, in full compliance with now applicable requirements, that under the post-*Booker*/*Fanfan* regime the sentence would have been essentially the same as originally imposed. Conversely, a district judge's decision that the original sentence would have differed in a nontrivial manner from that imposed will demonstrate that the error in imposing the original sentence was harmful and satisfies plain error analysis.

---

receiving a sentence that is an upward departure cannot show prejudice and therefore cannot establish plain error.

[32] Fanfan was one of the respondents in *Booker*.

*In short, a sentence imposed under a mistaken perception of the requirements of law will satisfy plain error analysis if the sentence imposed under a correct understanding would have been materially different.* [Some emphasis added.][33]

Thus, in accordance with this analysis, in cases in which a defendant's minimum sentence was established by application of the sentencing guidelines in a manner that violated the Sixth Amendment, the case should be remanded to the trial court to determine whether that court would have imposed a materially different sentence but for the constitutional error. If the trial court determines that the answer to that question is yes, the court shall order resentencing. *Id.* at 118.

A few comments on the proper procedures for trial courts to follow on so-called *Crosby* remands are in order to ensure consistency and stability. First, consistently with *Crosby*, we hold that *Crosby* remands are warranted only in cases involving sentences imposed on or before July 29, 2015, the date of today's decision. Accordingly, for

---

[33] The United States Court of Appeals for the Ninth Circuit has also adopted the *Crosby* remand procedure. See *United States v Ameline*, 409 F3d 1073 (CA 9, 2005). Further, the United States Court of Appeals for the Seventh Circuit and the United States Court of Appeals for the District of Columbia have adopted a similar remand procedure, although modifying it so that "the appellate court retains jurisdiction throughout the limited remand, and thus it is the *appellate court* that will 'vacate the sentence upon being notified by the judge that he would not have imposed it had he known that the guidelines were merely advisory.' " *United States v Coles*, 365 US App DC 280, 286; 403 F3d 764 (2005), quoting *United States v Paladino*, 401 F3d 471, 484 (CA 7, 2005). Other circuits have taken different approaches, creating a circuit split on the issue that more resembles a chasm. See, e.g., Nall, United States v Booker*: The Presumption of Prejudice in Plain Error Review*, 81 Chi-Kent L Rev 621, 635 (2006) (noting that "[e]ach of the twelve circuits has taken a slightly different tack in dealing with direct review of *Booker* error . . . ."). But as of yet, despite multiple petitions for certiorari asking it to address the issue, the United States Supreme Court has declined to clarify the proper approach. See, e.g., *Rodriguez v United States*, 545 US 1127; 125 S Ct 2935; 162 L Ed 2d 866 (2005).

defendants sentenced after our decision today, the traditional-plain error review from *Carines* will apply. See *id*. at 116 ("In cases involving review of sentences imposed *after* the date of *Booker/Fanfan*, we would expect to apply these prudential doctrines [including plain-error review] in the customary manner.").

Second, we conclude that a trial court considering a case on a *Crosby* remand should first and foremost "include an opportunity for a defendant to avoid resentencing by promptly notifying the [trial] judge that resentencing will not be sought." *Id*. at 118. If the defendant does not so notify the court, it "should obtain the views of counsel, at least in writing, but 'need not' require the presence of the Defendant," in "reaching its decision (with or without a hearing) whether to resentence." *Id*. at 120. Upon making that decision, the trial court shall "either place on the record a decision not to resentence, with an appropriate explanation, or vacate the sentence and, with the Defendant present, resentence in conformity with" this opinion. *Id*.

Stated differently, on a *Crosby* remand, a trial court should first allow a defendant an opportunity to inform the court that he or she will not seek resentencing. If notification is not received in a timely manner, the court (1) should obtain the views of counsel in some form, (2) may but is not required to hold a hearing on the matter, and (3) need not have the defendant present when it decides whether to resentence the defendant, but (4) must have the defendant present, as required by law,[34] if it decides to resentence the defendant. Further, in determining whether the court would have imposed a materially different sentence but for the unconstitutional constraint, the court should

---

[34] MCR 6.425.

35

consider only the "circumstances existing at the time of the original sentence." *Id*. at 117; see also *United States v Ferrell*, 485 F3d 687, 688 (CA 2, 2007) (holding that the trial court's failure to consider the circumstances as they existed at the time of the resentencing hearing, including evidence of the defendant's postjudgment prison rehabilitation, did not violate the defendant's due process rights).

## VII. CONCLUSION

Because Michigan's sentencing guidelines scheme allows judges to find by a preponderance of the evidence facts that are then used to compel an increase in the mandatory minimum punishment a defendant receives, it violates the Sixth Amendment to the United States Constitution under *Alleyne*. We therefore reverse the judgment below and overrule the Court of Appeals' decision in *Herron*. To remedy the constitutional flaw in the guidelines, we hold that they are advisory only.

To make a threshold showing of plain error that could require resentencing, a defendant must demonstrate that his or her OV level was calculated using facts beyond those found by the jury or admitted by the defendant and that a corresponding reduction in the defendant's OV score to account for the error would change the applicable guidelines minimum sentence range. If a defendant makes that threshold showing and was not sentenced to an upward departure sentence, he or she is entitled to a remand for the trial court for that court to determine whether plain error occurred, i.e., whether the court would have imposed the same sentence absent the unconstitutional constraint on its

36

discretion. If the trial court determines that it would not have imposed the same sentence but for the constraint, it must resentence the defendant.

We reverse the judgment of the Court of Appeals in part and affirm the defendant's sentence.

Bridget M. McCormack
Robert P. Young, Jr.
Mary Beth Kelly
David F. Viviano
Richard H. Bernstein

STATE OF MICHIGAN

SUPREME COURT

PEOPLE OF THE STATE OF MICHIGAN,

      Plaintiff-Appellee,

v

No. 149073

RAHIM OMARKHAN LOCKRIDGE,

      Defendant-Appellant.

_____

MARKMAN, J. (*dissenting*).

Following a jury trial, defendant was convicted of involuntary manslaughter under MCL 750.321, which carries a statutory maximum sentence of 15 years. The trial court sentenced defendant to a term of 8 to 15 years after departing upward from the statutory sentencing guidelines range of 43 to 86 months for defendant's minimum sentence. The court calculated the range by scoring various offense and prior record variables under a preponderance of the evidence standard. Defendant appealed his sentence, asserting that it was imposed contrary to the United States Supreme Court's decision in *Alleyne v United States*, 570 US ___; 133 S Ct 2151; 186 L Ed 2d 314 (2013), because his minimum sentence had been determined on the basis of facts that were not found by the jury beyond a reasonable doubt. The Court of Appeals affirmed defendant's sentence, and this Court granted leave to appeal to determine whether Michigan's "indeterminate" sentencing system, which allows a trial court to set a criminal defendant's minimum sentence, i.e., his or her parole eligibility date, on the basis of factors determined by a

preponderance of the evidence, is in violation of the Sixth Amendment of the United States Constitution. The majority holds today that our state's sentencing system does, in fact, violate the Sixth Amendment. Because I respectfully disagree with this holding and do not believe our sentencing system violates the Constitution, I dissent.

## I. FACTS AND HISTORY

The victim in this case, Ms. Kenyatta Lockridge, and defendant were married and had a history of domestic violence. This history resulted in defendant's being placed on probation, a condition of which was that he not have contact with Ms. Lockridge or visit her residence. Defendant, however, continued to have contact with Ms. Lockridge and continued to live at her residence. On September 19, 2011, Ms. Lockridge accused defendant of stealing money from her purse and an argument ensued. The argument eventually turned violent when Ms. Lockridge punched defendant in the face twice. In response, defendant placed his arm around Ms. Lockridge's neck and proceeded to place her in a choke hold. Once Ms. Lockridge stopped resisting, defendant dropped her on the floor in front of their three daughters and left the house. Ms. Lockridge was declared dead at the hospital, the cause of her death being asphyxiation due to neck compression.

Defendant was charged with one count of open murder, MCL 750.316, and on May 4, 2012, the jury found defendant guilty of involuntary manslaughter, MCL 750.321. At sentencing, the trial court scored defendant's offense variables and prior record variables and determined that his offense variable level was 70 points and his prior record variable level was 35 points. See footnote 10 of this opinion. These figures placed defendant in the D-V cell of the Class C sentencing grid, which contains a recommended minimum guidelines range of 43 to 86 months. MCL 777.16p;

2

MCL 777.64. The trial court further held that there were substantial and compelling reasons to depart upward from the guidelines range by 10 months, ultimately sentencing defendant to a term of 8 to 15 years. The trial court justified its departure by citing offense variables that assertedly failed adequately to take into account the psychological injury suffered by the victim's children, while also referring to defendant's willful disregard for the conditions of his probation.

Defendant appealed his sentence in the Court of Appeals. Pending that court's consideration, the Supreme Court decided *Alleyne v United States*, which held that "any fact that increases the mandatory minimum is an 'element' that must be submitted to the jury." *Alleyne*, 570 US at ___; 133 S Ct at 2155. Defendant claimed that he had been sentenced to a term of incarceration that had been unconstitutionally enhanced by *judicial*, not by the required *jury*, fact-finding, and the Court of Appeals allowed him to add an additional claim under *Alleyne* to his appeal. Ultimately, the Court of Appeals denied defendant's claim, citing *People v Herron*, 303 Mich App 392; 845 NW2d 533 (2013), for the proposition that our indeterminate sentencing system does not offend the Sixth Amendment and noting that the panel was required to follow *Herron*. *People v Lockridge*, 304 Mich App 278, 284; 849 NW2d 388 (2014) (opinion by O'CONNELL, J.); *id*. at 285 (opinion by BECKERING, P.J.); *id*. at 311 (opinion by SHAPIRO, J.).

## II. STANDARD OF REVIEW

The issue in this case is whether Michigan's sentencing system operates in violation of the Sixth Amendment of the United States Constitution by permitting a criminal defendant's minimum sentence to be determined on the basis of facts not proved

3

to the jury beyond a reasonable doubt.  A Sixth Amendment challenge presents a question of constitutional law that we review de novo.  *People v Nutt,* 469 Mich 565, 573; 677 NW2d 1 (2004).  Furthermore, a constitutional challenge to a statute presents a question of law that is also reviewed de novo.  *McDougall v Schanz,* 461 Mich 15, 23; 597 NW2d 148 (1999).  In analyzing constitutional challenges to statutes, this Court's "authority to invalidate laws is limited and must be predicated on a clearly apparent demonstration of unconstitutionality."  *People v Harris*, 495 Mich 120, 134; 845 NW2d 477 (2014).  We require a challenge to meet such a high burden because "[s]tatutes are presumed to be constitutional, and we have a duty to construe a statute as constitutional unless its unconstitutionality is clearly apparent."  *In re Sanders*, 495 Mich 394, 404; 852 NW2d 524 (2014), citing *Taylor v Gate Pharm*, 468 Mich 1, 6; 658 NW2d 127 (2003).

## III.  ANALYSIS

### A.  SIXTH AMENDMENT

The Sixth Amendment of the United States Constitution provides:

> In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law, and to be informed of the nature and cause of the accusation . . . .  [US Const, Am VI.]

This amendment pertains to one of the most fundamental elements of our equal rule of law-- the right to a trial by jury.[1]  The fundamental purpose of the right to a trial by jury

---

[1] "The friends and adversaries of the plan of the convention, if they agree in nothing else, concur at least in the value they set upon the trial by jury; Or if there is any difference between them it consists in this; the former regard it as a valuable safeguard to liberty, the latter represent it as the very palladium of free government."  Federalist, No. 83

4

is indisputably "to prevent oppression by the Government." *Duncan v Louisiana*, 391 US 145, 155; 88 S Ct 1440; 20 L Ed 2d 491 (1968), citing *Singer v United States*, 380 US 24, 31; 85 S Ct 783; 13 L Ed 2d 630 (1965). "Given this purpose, the essential feature of a jury obviously lies in the interposition between the accused and his accuser of the commonsense judgment of a group of laymen, and in the community participation and shared responsibility that results from that group's determination of guilt or innocence." *Williams v Florida*, 399 US 78, 99; 90 S Ct 1893; 26 L Ed 2d 446 (1970).[2] Stated another way, the "Constitution gives a criminal defendant the right to demand that a jury find him guilty of all the elements of the crime with which he is charged . . . ."[3] *United States v Gaudin*, 515 US, 506, 511; 115 S Ct 2310; 132 L Ed 2d 444 (1995).

---

(Alexander Hamilton) (Cooke ed, 1961), p 562.

[2] Justice Joseph Story wrote that this constitutional guarantee was "generally understood to mean . . . a trial by a jury of *twelve* men, impartially selected, who must *unanimously* concur in the guilt of the accused before a legal conviction can be had." 2 Story, Commentaries on the Constitution of the United States (4th ed) (Boston: Little, Brown & Company, 1873), p 541 n 2.

[3] It is important at the outset to understand that the Sixth Amendment right to a jury trial cannot be fully understood in isolation from the Due Process Clause of the Fifth and Fourteenth Amendments because it is only in conjunction that "these rights indisputably entitle a criminal defendant to 'a jury determination that [he] is guilty of every element of the crime with which he is charged, beyond a reasonable doubt.' " *Apprendi v New Jersey*, 530 US 466, 476; 120 S Ct 2348; 147 L Ed 2d 435 (2000), citing *Gaudin*, 515 US at 510. This is because the Sixth Amendment guarantees a criminal defendant "the right to have the jury, rather than the judge, reach the requisite finding of 'guilty,' " and the Due Process Clause requires the government to prove each and every element of a crime "beyond a reasonable doubt." *Sullivan v Louisiana*, 508 US 275, 277; 113 S Ct 2078; 124 L Ed 2d 182 (1993); see also *Patterson v New York*, 432 US 197, 210; 97 S Ct 2319; 53 L Ed 2d 281 (1977); *In re Winship*, 397 US 358, 368; 90 S Ct 1068; 25 L Ed 2d 368 (1970). Accordingly, it is the *combination* of these rights that gives rise to the constitutional right that is the subject of the instant case.

## B. SIXTH AMENDMENT AND SENTENCING

The Sixth Amendment requires "a jury determination that [a defendant] is guilty of every element of the crime with which he is charged, beyond a reasonable doubt." *Id.* at 510. In defining the protections afforded by this right, the United States Supreme Court has held that any fact that constitutes an "element" of the crime must be determined by the jury, not by the court, beyond a reasonable doubt. *Apprendi v New Jersey*, 530 US 466, 494; 120 S Ct 2348; 147 L Ed 2d 435 (2000). The breadth of this right therefore depends on "the proper designation of the facts that are elements of the crime." *Alleyne*, 570 US at ___; 133 S Ct at 2156. To ensure that the right to a jury trial is properly safeguarded, the United States Supreme Court has set out to explain what exactly constitutes an "element" of a crime for purposes of the Sixth Amendment, so that the necessary elements will be submitted to the jury for its consideration and determination.[4] In its efforts to explain what constitutes an "element" of a crime, the Supreme Court has identified several sentencing practices that operated in violation of the Sixth Amendment.

The Supreme Court first addressed the Sixth Amendment implications that arise when judicially ascertained facts are used to enhance a criminal defendant's sentence in

---

[4] At the same time, the Supreme Court has held that mere "sentencing factors" may be ascertained by a judge using a preponderance of the evidence standard, as these factors are not subject to the Constitution's indictment, jury, and proof requirements. *Jones v United States*, 526 US 227, 232; 119 S Ct 1215; 143 L Ed 2d 311 (1999) ("Much turns on the determination that a fact is an element of an offense rather than a sentencing consideration, given that elements must be charged in the indictment, submitted to a jury, and proven by the Government beyond a reasonable doubt.").

6

*McMillan v Pennsylvania*, 477 US 79; 106 S Ct 2411; 91 L Ed 2d 67 (1986). *McMillan* involved a Pennsylvania statute that imposed a five year "mandatory minimum" sentence when the trial court determined by a preponderance of the evidence that the defendant "visibly possessed a firearm" during the course of committing an enumerated felony. *Id.* at 81. In a 5-4 decision, the Court upheld the Pennsylvania statute, concluding that it

> neither alters the maximum penalty for the crime committed nor creates a separate offense calling for a separate penalty; it operates solely to limit the sentencing court's discretion in selecting a penalty within the range already available to it without the special finding of visible possession of a firearm. [*Id.* at 87-88.]

Because the imposition of the mandatory minimum sentence had not altered the maximum penalty authorized by the jury's verdict, the Court sustained the statute, rejecting a Sixth Amendment challenge.

While *McMillan* sanctioned the use of judicial fact-finding to establish a mandatory *minimum* sentence, a decade later in *Jones v United States*, 526 US 227, 239; 119 S Ct 1215; 143 L Ed 2d 311 (1999), the Supreme Court cautioned that the use of such facts to increase the *maximum* sentence presented "grave and doubtful constitutional questions." (Quotation marks and citation omitted.) In *Jones*, the defendant was convicted of violating a carjacking statute, which called for a 15-year maximum sentence. 18 USC 2119. This sentence, however, could be increased to 25 years if the judge determined by a preponderance of the evidence that the victim had suffered serious bodily injury, or to life in prison if the victim had died. 18 USC 924(c). Three tiers of sentencing were provided under the statute. The trial court imposed the 25-year sentence after it found that the victim had suffered serious bodily injury. *Jones*, 526 US at 231.

7

The Supreme Court, however, vacated the sentence in a 5-4 decision, holding that the defendant's Sixth Amendment right to a jury trial was violated because the judge had determined by a preponderance of the evidence that the victim suffered "serious bodily injury," rather than the jury's having determined the same question beyond a reasonable doubt. *Id*. at 252.

In *Jones*, the jury found all the elements necessary to incarcerate the defendant for 15 years and *that* finding conferred on him not only the legal *obligation* of potentially having to serve a sentence of that length, but also a concomitant legal *right* to a sentence not exceeding that length.[5]  By its finding of facts that resulted in an increase in this level of punishment by 10 years, the trial court deprived the defendant of his legal right to a sentence that did not exceed 15 years, i.e., his legal right to a sentence that did not exceed the maximum term allowed by the jury's verdict.  The Court held that this type of judicial fact-finding violated the Sixth Amendment.

The following term in *Apprendi v New Jersey*, 530 US 466, the Supreme Court elaborated on its analysis in *Jones*.  In *Apprendi*, the defendant pleaded guilty to one

---

[5] Although I describe this right throughout as a "legal" right, it would be equally accurate to describe it as a "constitutional" right.  I characterize it as the former only to render our description consistent with that in *Blakely Washington*, 542 US 296, 309; 124 S Ct 2531; 159 L Ed 2d 403 (2004), in which it was asserted that the Sixth Amendment prohibits a judge from depriving a criminal defendant of his or her "legal *right* to a lesser sentence." The specific "legal right" that is the subject of this opinion is variously described, as the context requires, as "the legal right to a sentence not to exceed that determined by the jury"; "the legal right to a lesser sentence"; "the legal right to freedom from incarceration"; and "the legal right to freedom from incarceration after having served the maximum sentence."  Each of these is intended generally to describe the Sixth Amendment right identified in the Supreme Court decisions of *Apprendi* and *Alleyne*.

count of possessing a weapon for an unlawful purpose, which was punishable by a term of imprisonment between 5 and 10 years. *Id.* at 468-469. New Jersey, however, had a statutory "hate crime" law that provided for an extended term of imprisonment between 10 and 20 years when the trial court found by a preponderance of the evidence that the defendant had acted with "racial bias." The trial court in *Apprendi* found the requisite "racial bias" by a preponderance of the evidence and consequently sentenced the defendant to an enhanced 12-year term. *Id.* at 471. In yet another 5-4 decision, the Supreme Court held that New Jersey's practice of enhancing a criminal defendant's sentence on the basis of judicial fact-finding was unconstitutional. *Id*. at 490. The Court held:

> "[I]t is unconstitutional for a legislature to remove from the jury the assessment of facts that increase the prescribed range of penalties to which a criminal defendant is exposed. . . . [S]uch facts must be established by proof beyond a reasonable doubt." [*Id*., quoting *Jones*, 526 US at 252-253 (first alteration in original).]

Stated another way, judicially ascertained facts were used by the trial court to deprive the defendant of his constitutional right to a criminal sentence not exceeding that authorized by the jury's verdict. The Court was not persuaded by the statute's characterization of a "biased purpose" as a mere "sentencing enhancement" because the Court believed instead that this "biased purpose" constituted an element of the crime. *Apprendi*, 530 US at 495-496. The Court again stated:

> "[The Constitution requires that] any fact (other than a prior correction) that increases the maximum penalty for a crime must . . . be submitted to the jury and proved beyond a reasonable doubt." [*Id*. at 476, quoting *Jones*, 526 US at 243 n 6.]

9

Accordingly, any fact that "expose[s] the defendant to a greater punishment than that authorized by the jury's guilty verdict," constitutes an "element" of the crime that must be presented to the jury and proven beyond a reasonable doubt.[6] *Apprendi*, 530 US at 494.

After *Apprendi*, which addressed the constitutional implications of judicially ascertained facts used to increase statutory *maximum* sentences, the United States Supreme Court addressed the Sixth Amendment implications of judicially ascertained facts used to increase "mandatory minimum" sentences. *Harris v United States*, 536 US 545; 122 S Ct 2406; 153 L Ed 2d 524 (2002), overruled by *Alleyne*, 570 US at ___; 133 S Ct at 2155. In *Harris*, the defendant was found guilty of violating various federal drug and firearms laws after he sold illegal narcotics out of his pawnshop while in possession

---

[6] Justice O'Connor wrote for four justices in dissent in *Apprendi*. In her view, the majority had crafted a new constitutional rule that was "unsupported by the history and case law it cites" and this fact alone is "reason enough to reject such a substantial departure from our settled jurisprudence." *Apprendi*, 530 US at 539 (O'Connor, J., dissenting). She also characterized the majority's opinion as "a watershed change in constitutional law," and went on to note that the majority "casts aside our traditional cautious approach and instead embraces a universal and seemingly bright-line rule limiting the power of Congress and state legislatures to define criminal offenses and the sentences that follow from convictions thereunder." *Id*. at 525. Justice Breyer also wrote in dissent on behalf of himself and Chief Justice Rehnquist, noting that the

> real world of criminal justice cannot hope to meet any such ideal [as that adopted by the majority]. It can function only with the help of procedural compromises, particularly in respect to sentencing. And those compromises, which are themselves necessary for the fair functioning of the criminal justice system, preclude implementation of the procedural model that today's decision reflects. [*Id*. at 555 (Breyer, J., dissenting).]

of an unconcealed pistol. *Harris*, 536 US at 550. One of the statutes under which the defendant was convicted required an increase in the "mandatory minimum" sentence from 5 years to 7 years when the judge determined by a preponderance of the evidence that the defendant had "brandished" a weapon. 18 USC 924(c)(1)(A). Although the defendant's indictment made no mention of any "brandishing," the trial court concluded that he had indeed done so and sentenced him to a 7-year mandatory minimum term. *Harris*, 536 US at 551.

In a plurality opinion, the Supreme Court upheld the defendant's sentence, concluding that the requirement of "brandishing" constituted a sentencing factor that could be found by the trial court and not an "element" that could be found only by the jury. *Id*. at 556. The Court also reaffirmed *McMillan*, holding that it was constitutional for a trial court to find by a preponderance of the evidence facts that increased the minimum punishment as long as the resulting punishment did not exceed the statutory maximum. *Id*. at 562. The Court opined that "[o]nce the jury finds all those facts, . . . the defendant has been convicted of the crime; the Fifth and Sixth Amendments have been observed; and the Government has been authorized to impose any sentence below the maximum." *Id*. at 565.

Two years after *Harris*, the Supreme Court was presented with a Sixth Amendment challenge to Washington's "determinate" sentencing guidelines in *Blakely v Washington* and took it as an opportunity to further clarify the meaning of a "statutory maximum" for purposes of *Apprendi*.[7] *Blakely v Washington*, 542 US 296, 298; 124 S Ct

---

[7] A determinate sentence is a sentence "of a specified duration." *Black's Law Dictionary*

11

2531; 159 L Ed 2d 403 (2004). In *Blakely*, the defendant had been convicted of second-degree kidnapping, a Class B felony, and Washington law provided for a maximum sentence of 10 years for this crime. *Id*. at 298-299. However, Washington's sentencing reform act provided a specific sentence range for a defendant's conviction of second-degree kidnapping with a firearm, providing a "standard range" of 49 to 53 months. The act also permitted a court to impose a sentence longer than the standard range if the judge found "substantial and compelling reasons justifying an exceptional sentence." The trial court departed upward from the standard range by 37 months and sentenced the defendant to 90 months' imprisonment for the second-degree-kidnapping conviction after finding that he had acted with "deliberate cruelty." *Id.* at 300.

The state of Washington contended that its sentencing scheme did not violate *Apprendi* because the defendant's relevant "statutory maximum" was not 53 months, but the 10-year maximum for Class B felonies. *Id*. at 303. The Supreme Court disagreed and by a 5-4 majority concluded that the "statutory maximum" for *Apprendi* purposes is the maximum sentence a judge may impose "solely on the basis of the facts reflected in the jury verdict or admitted by the defendant," which for purposes of the second-degree-kidnapping conviction was 53 months. *Id*. at 304. The Court elaborated:

---

(10th ed), p 1569. This is in contrast to an "indeterminate" sentence, which is a sentence "of an unspecified duration, such as one for a term of 10 to 20 years." *Id*. at 1570. Thus, a determinate system is a sentencing system in which the defendant receives a certain and fixed sentence and is subject to serving that precise sentence. An indeterminate system is a sentencing system in which the defendant receives a singular maximum sentence, and, in some systems such as Michigan's, may be released on parole before serving that maximum.

12

In other words, the relevant "statutory maximum" is not the maximum sentence a judge may impose after finding additional facts, but the maximum he may impose without any additional findings. When a judge inflicts punishment that the jury's verdict alone does not allow, the jury has not found all the facts "which the law makes essential to the punishment." [*Id*. at 303-304 (citation omitted).]

Thus, the Court noted that the finding of "deliberate cruelty" had to be undertaken by a jury or else admitted by the defendant, and in the absence of these circumstances a sentence based on "deliberate cruelty" would operate in violation of the Sixth Amendment. *Id*. at 308.

In reaching this decision, the Supreme Court made clear that the Sixth Amendment does not prohibit judicial fact-finding per se, as the Court explicitly stated its approval of systems of "indeterminate" sentencing:

By reversing the judgment below, we are not, as the State would have it, "find[ing] determinate sentencing schemes unconstitutional." This case is not about whether determinate sentencing is constitutional, only about how it can be implemented in a way that respects the Sixth Amendment. . . .

JUSTICE O'CONNOR argues that, because determinate-sentencing schemes involving judicial fact-finding entail less judicial discretion than indeterminate schemes, the constitutionality of the latter implies the constitutionality of the former. This argument is flawed on a number of levels. First, the Sixth Amendment by its terms is not a limitation on judicial power, but a reservation of jury power. It limits judicial power only to the extent that the claimed judicial power infringes on the province of the jury. *Indeterminate sentencing does not do so.* It increases judicial discretion, to be sure, but not at the expense of the jury's traditional function of finding the facts essential to lawful imposition of the penalty. Of course indeterminate schemes involve judicial fact-finding, in that a judge (like a parole board) may implicitly rule on those facts he deems important to the exercise of his sentencing discretion. But the facts do not pertain to whether the defendant has *a legal right to a lesser sentence*—and that makes all the difference insofar as judicial impingement upon the traditional role of the jury is concerned. In a system that says the judge may punish burglary with 10 to 40 years, every burglar knows he is risking

13

40 years in jail. In a system that punishes burglary with a 10-year sentence, with another 30 added for use of a gun, the burglar who enters a home unarmed is entitled to no more than a 10-year sentence—and by reason of the Sixth Amendment the facts bearing upon that entitlement must be found by a jury. [*Id*. at 308-309 (citations omitted) (some emphasis added) (alteration in original).]

From this passage, it is apparent that the Supreme Court looked favorably on indeterminate sentencing systems. A majority of the Court did not believe that indeterminate sentencing offended the Sixth Amendment, even if it involved relatively broad exercises in judicial fact-finding, because fact-finding in an indeterminate system does not "pertain to whether the defendant has a legal right to a lesser sentence." *Id*. at 309.

Following *Blakely*, the Supreme Court was faced with a challenge to the "determinate" federal sentencing guidelines in *United States v Booker*, 543 US 220; 125 S Ct 738; 160 L Ed 2d 621 (2005). In *Booker*, the defendant challenged the federal guidelines as unconstitutional because they allowed for the enhancement of sentences on the basis of facts determined by the trial court by a preponderance of the evidence. *Id*. at 226. The Supreme Court agreed and held that the guidelines violated the rule in *Apprendi*. Just as with the state of Washington's sentencing system in *Blakely*, the Court by a 5-4 majority concluded that the federal sentencing system was mandatory, that it imposed binding requirements on sentencing courts, and again as in *Blakely*, that " 'the jury's verdict alone [did] not sufficiently authorize the sentence. . . . The judge acquire[d] that authority only upon finding some additional fact.' " *Id*. at 235, quoting *Blakely*, 542 US at 305. The Court elaborated:

If the Guidelines as currently written could be read as merely advisory provisions that recommended, rather than required, the selection

14

of particular sentences in response to differing sets of facts, their use would not implicate the Sixth Amendment. We have never doubted the authority of a judge to exercise broad discretion in imposing a sentence within a statutory range. . . . [W]hen a trial judge exercises his discretion to select a specific sentence within a defined range, the defendant has no right to a jury determination of the facts that the judge deems relevant. [*Booker* 543 US at 233.]

However, the determinate federal guidelines were not advisory, but mandatory and binding, and therefore were unconstitutional. Once a trial court ascertained a particular aggravating fact, it was required to increase a defendant's sentence accordingly and this resulted in a deprivation of the "legal right to a lesser [jury-determined] sentence." *Id*.

### C. MICHIGAN'S SENTENCING GUIDELINES

After *Blakely* and *Booker* were decided, several defendants contended that Michigan's indeterminate sentencing guidelines violated the Sixth Amendment. Specifically, they argued that the use of judicially ascertained facts to calculate Michigan's indeterminate sentencing guidelines increases the level of permitted punishments beyond the range authorized by the jury's verdict and that the Sixth Amendment as interpreted by *Blakely* is therefore violated. This argument was squarely rejected by this Court in *People v Drohan*, 475 Mich at 140, 164; 715 NW2d 778 (2006).

To fully understand this Court's prior analysis regarding Sixth Amendment challenges to our sentencing system, it is necessary to examine how this system operates.[8] It is a sentencing system fundamentally different from the determinate

---

[8] Michigan initially had a purely indeterminate sentencing system, in which the judge possessed unfettered judgment to sentence a defendant anywhere between no jail time and imprisonment in the amount of the statutory maximum. Over time, this Court came to disfavor the sentencing disparities that resulted from this type of unrestricted judgment. To narrow these disparities, this Court enacted judicial sentencing guidelines

sentencing systems at issue in *Apprendi*, *Blakely*, and *Booker* because in Michigan the great majority of all convicted criminals are given indeterminate sentences.[9]  As this Court has pertinently explained:

in 1984 by administrative order.  Administrative Order No. 1984-1, 418 Mich lxxx (1984); Administrative Order No. 1985-2, 420 Mich lxii (1985).  Under these judicial guidelines, a recommended minimum sentence range was produced by scoring a defendant's prior record variables and offense variables; once a recommended minimum sentence range was calculated in this manner, the judge could only depart outside this range if he or she articulated specific reasons for the departure on the record.  *People v Broden*, 428 Mich 343, 352; 408 NW2d 789 (1987).  A second edition of the judicial guidelines was issued in 1988, and application of these modified guidelines was required for certain offenses, although the actual imposition of minimum sentences within the guidelines ranges themselves was not also required.  Michigan Sentencing Guidelines (2d ed) (1988), p 7.  The purpose of the guidelines was to provide sentencing norms, to promote judicial consistency, and to minimize sentencing disparities without altogether eliminating the court's exercise of judgment.  *People v Coles*, 417 Mich 523; 339 NW2d 440 (1983).  The citizens of this state were apparently still dissatisfied with remaining sentencing disparities, and the Legislature enacted the statutory guidelines in 1998.  Similarly to the judicial guidelines, the statutory guidelines structured and constrained the exercise of judgment by the trial court without entirely eliminating it.  Unlike the judicial guidelines, however, the statutory guidelines generally *required* trial courts to sentence within the guidelines, and they could not depart from the prescribed range without stating "substantial and compelling" reasons for the specific departure on the record.  MCL 769.34(3).

[9] The majority agrees that the rules of *Apprendi* and *Alleyne* do not apply to "indeterminate" sentencing schemes, yet it applies these rules to Michigan's indeterminate sentencing system.  To justify this application, the majority holds that "Michigan's sentencing scheme is not 'indeterminate' as that term has been used by the United States Supreme Court[.]"  To hold thusly, the majority relies on the *dissent* of Justice O'Connor in *Blakely* and two law review articles.  These sources suggest that the Supreme Court's genuine intention in referring to "indeterminate" sentencing was to discuss indeterminate sentencing systems in which there is an "absence of mandatory constraints placed on a court's discretion when sentencing a defendant," and because Michigan has mandatory constraints, ours is not an "indeterminate" system in the way that term is used by the United States Supreme Court.  I disagree.  Michigan has an "indeterminate" sentencing system in which the jury finds all facts necessary for the imposition of punishment, Const 1963, art 4, § 45; *Drohan*, 475 Mich at 163, and

consequently the rule of *Apprendi* is inapplicable. The majority's is an invented distinction that *Apprendi* is applicable only to some asserted *subcategory* of "indeterminate" sentencing systems-- a subcategory whose very obviousness one might have thought would have compelled a more nuanced analysis by the Court had it genuinely intended some number of "indeterminate" systems to be treated distinctively from other "indeterminate" systems-- and is therefore a distinction that should hardly serve as a basis for upending the entire sentencing system of our state on the grounds of a supposed lack of constitutionality. In *Blakely*, the United States Supreme Court spoke in *general* terms concerning indeterminate sentencing systems and held that "indeterminate" systems do not offend the Sixth Amendment. *Blakely*, 542 US at 308-309. Any assertion that the Court intended something different and more nuanced is entirely speculative, as evidenced by the fact that the majority cites no source of *binding* authority to support its conclusion in the face of inhospitably explicit statements by the Court.

Furthermore, the majority's artificial distinction between types of indeterminate systems holds little weight when one examines the specific statements the United States Supreme Court has made regarding indeterminate sentencing. The Court stated, for example, in *Blakely*:

> [T]he Sixth Amendment by its terms is . . . a reservation of jury power. It limits judicial power only to the extent that the claimed judicial power infringes on the province of the jury. Indeterminate sentencing does not do so. It increases judicial discretion, to be sure, but *not at the expense of the jury's traditional function of finding facts essential to lawful imposition of the penalty*. [*Id*. (emphasis added).]

Under *either* subcategory of indeterminate sentencing identified by the majority, any judicial discretion at sentencing is not at the "expense of the jury's traditional function of finding facts essential to the lawful imposition of the penalty." Rather, the jury is responsible for finding all facts *essential* to authorize the statutory maximum penalty. Whether the Legislature chooses to allow judicial discretion with respect to the selection of a parole eligibility date after the jury has exercised this authority is irrelevant. In noting that indeterminate sentencing schemes do not offend the Sixth Amendment, the United States Supreme Court focused only on whether the judicial power infringes the jury's authority to find facts essential to authorize the maximum penalty. The extent of judicial discretion *after* the jury finds those facts is never mentioned by the Court. It is clear that the Court in *Blakely* was referring *generally* to indeterminate sentencing as it showed no concern with the amount of discretion given to courts as long as that discretion did not enable the judge to interfere with the prerogative of the jury. There is

17

An indeterminate sentence is one of an unspecified duration, such as one for a term of 10 to 20 years. In other words, while a defendant may serve a sentence of up to 20 years, the defendant may be released from prison at the discretion of the parole board at any time after the defendant serves the ten-year minimum. [*Drohan*, 475 Mich at 153 n 10 (quotation marks and citations omitted).]

A determinate sentence, on the other hand, is

[a] sentence for a fixed length of time rather than an unspecified duration. Such a sentence can either be for a fixed term from which the trial court cannot deviate . . . or can be imposed by the trial court within a certain range. [*Id.* (quotation marks and citations omitted) (alteration in original).]

Under Michigan's indeterminate sentencing guidelines, a criminal defendant's maximum sentence is prescribed by statute, and upon a guilty verdict the defendant is made subject to serving this maximum sentence. *Drohan*, 475 Mich at 163. That is, the jury's guilty verdict authorizes punishment of a criminal defendant to the maximum extent allowed by the statute under which he or she has been convicted. At sentencing, the judge's exercise of judgment is limited solely to selecting a minimum sentence, i.e., a sentence establishing the defendant's earliest *parole eligibility* date from within a "recommended

---

thus no indication that the Court referred to indeterminate sentencing in either a casual or imprecise manner.

As for the majority's reliance on Justice O'Connor's *Blakely* dissent, she asserted that as a result of *Blakely* all sentencing schemes that have guidelines might be constitutionally suspect. Yet at the same time, she stated that *Blakely* is "not a constitutional prohibition on guideline schemes," *Blakely*, 542 US at 318, and nowhere asserted that the Michigan system is a "determinate system. Further, *this Court* has also exercised its own constitutional judgment post-*Blakely* as the court most familiar with Michigan's sentencing system and held that it does not violate the Sixth Amendment. *Drohan*, 475 Mich at 164. Apparently, the United States Supreme Court did not believe this conclusion to be in error. *Drohan v Michigan*, 549 US 1037 (2006) (denying certiorari).

18

minimum sentence range" that is calculated by reference to the defendant's statutory "prior record variables" and "offense variables." The range produced is meant to guide the court in selecting a criminal defendant's minimum parole eligibility date,[10] and it has *no* effect on the criminal "punishment" imposed on a defendant as a result of the jury's verdict. MCL 769.34; MCL 791.238.

Once the judge determines the recommended minimum sentence range for a criminal defendant, it may either impose a sentence within that range or choose to depart upward or downward from that range if the judge sets forth on the record "substantial and compelling reasons" justifying that departure. MCL 769.34(3). Once the judge selects a

---

[10] Take the instant defendant, for example. He was found guilty of committing involuntary manslaughter, which is a "crime against a person," MCL 777.16p, and MCL 777.21(1)(a) and MCL 777.22(1) require the court to score Offense Variables 1, 2, 3, 4, 7, 8, 9, 10, 11, 12, 13, 14, 19 and 20 for this type of crime. At sentencing, the trial court assessed 25 points for Offense Variable 3 (physical injury to victim) under MCL 777.33(1)(c). Because a homicide was involved, the trial court also assessed 15 points for Offense Variable 5 (psychological injury to member of victim's family) under MCL 777.35(1)(a) and 10 points for Offense Variable 6 (intent to kill or injure another individual) under MCL 777.36(1)(c). The court assessed 10 points for Offense Variable 9 (number of victims) under MCL 777.39(1)(c) and 10 points for Offense Variable 10 (exploitation of a vulnerable victim) under MCL 777.40(1)(b). This amounted to a total of 70 offense variable points. In addition to this determination, defendant had several prior criminal convictions, which led to the scoring of additional points. The court assigned 25 points under MCL 777.51(1)(c) for Prior Record Variable 1 for having one prior high severity felony conviction, 5 points under MCL 777.55(1)(d) for Prior Record Variable 5 for having two prior misdemeanor convictions or prior misdemeanor juvenile adjudications, and 5 points under MCL 777.56(1)(d) for Prior Record Variable 6 for being on probation during the instant offense. This amounted to a total of 35 prior record variable points. The crime that defendant was convicted of is a Class C offense under MCL 777.16p, and thus, the 70 offense variable points and the 35 prior record variable points placed him in the D-V cell of the sentencing grid for Class C offenses, which contains a "recommended minimum sentence range" of 43 to 86 months, MCL 777.64.

minimum sentence, the defendant must serve that amount of time before he or she can petition the Parole Board for early release, but the defendant has no legal right to be released even a day sooner than the statutory maximum to which he or she has been made subject by the jury's determination. See *Drohan*, 475 Mich at 163. As a result, an increase in a defendant's minimum parole eligibility date does not "expose the defendant to a greater punishment than that authorized by the jury's verdict[.]" *Apprendi*, 530 US at 494.

By contrast, in the determinate sentencing systems at issue in *Apprendi*, *Blakely*, and *Booker*, the judge was authorized as a function of the jury's verdict to impose an ancillary or supplemental sentence by which the judge, and not the jury, ultimately determined a defendant's exposure to criminal punishment. That is, the judge is charged with deciding how much punishment to impose on a criminal defendant, rather than merely deciding how long the defendant must wait before he or she can petition for early release from the punishment imposed upon him by the jury's verdict. If the judge imposes punishment in excess of that authorized by the jury's verdict, the defendant's Sixth Amendment rights have been violated because judges cannot "expose the defendant to a greater punishment than that authorized by the jury's verdict[.]" *Id*.

### D. MICHIGAN PRE-*ALLEYNE*

With this understanding of our state's sentencing guidelines, this Court has held that the decisions of the United States Supreme Court regarding criminal sentencing in *Apprendi*, *Blakely*, and *Booker* do not apply to Michigan's indeterminate sentencing

20

system because the authority of the judge never infringes upon the authority of the jury in Michigan.[11] *Drohan*, 475 Mich at 163. While there are considerable elements of sentencing judgment within our criminal justice system, the paramount authority in setting the maximum exposure to punishment that a criminal defendant faces remains with the jury, and *that* is what is dispositive under the Sixth Amendment and the Due Process Clause jurisprudence of the United States Supreme Court.

This Court first addressed the various challenges to Michigan's sentencing system under *Apprendi* and *Blakely* (but preceding *Booker*) in *People v Claypool*, 470 Mich at 715; 684 NW2d 278 (2004). In that case, we were faced with a challenge regarding a downward departure from the guidelines, and we took the opportunity to opine on *Blakely*. We noted that *Blakely* did not affect Michigan's "indeterminate" sentencing system because the Supreme Court had been clear that its decisions only affected

---

[11] Once again, in Michigan, the judge does not have the authority to determine a defendant's maximum sentence, and as a result cannot deprive a defendant of his or her "legal *right* to a lesser sentence." Rather, the judge assigns a defendant a minimum parole eligibility date, which represents the earliest possible date on which the defendant may petition the Parole Board for early release. The assignment of a parole eligibility date is not a constitutionally mandated function of the court, but rather is a product of an entirely statutory system in which the Legislature has afforded criminal defendants an opportunity to demonstrate that they are rehabilitated or otherwise deserving of release. If the Parole Board concurs with the defendant, it has the option to release a defendant from prison *before* the expiration of the maximum sentence. By this process, a Michigan judge never *enhances* the maximum penal consequences of the jury's determination of guilt when setting the parole eligibility date. This process does not affect the *punishment* imposed on the defendant because a criminal defendant released on parole is treated as if he or she is still serving the sentence, MCL 791.238, and because a defendant has no constitutional right to an early release on parole, *Greenholtz v Inmates of Nebraska Penal & Correctional Complex*, 442 US 1, 11; 99 S Ct 2100; 60 L Ed 2d 668 (1979).

"determinate" sentencing systems, and not "indeterminate" ones. *Id*. at 730 n 14 ("[T]he majority in [*Blakely*] made clear that the decision did not affect indeterminate sentencing systems."). We stated further:

> Michigan, in contrast, has an indeterminate sentencing system in which the defendant is given a sentence with a minimum and a maximum. The maximum is not determined by the trial judge but is set by law. MCL 769.8. The minimum is based on guidelines ranges as discussed in the present case and in [*People v*] *Babcock* [469 Mich 247; 666 NW2d 231 (2003)]. The trial judge sets the minimum but can never exceed the maximum (other than in the case of a habitual offender, which we need not consider because *Blakely* specifically excludes the fact of a previous conviction from its holding). [*Id*.]

Because the minimum indeterminate sentence selected by the judge can never exceed the maximum set by law, the "Michigan system is unaffected by the holding in *Blakely* that was designed to protect the defendant from a higher sentence based on facts not found by the jury in violation of the Sixth Amendment." *Id*.

Two terms later, we were faced with a direct challenge to Michigan's sentencing system in *Drohan*, 475 Mich at 142-143, in which this Court considered "whether Michigan's indeterminate sentencing system, which allows a trial court to set a defendant's minimum sentence on the basis of factors determined by a preponderance of the evidence, violates the Sixth Amendment . . . ." This Court concluded that it did not, emphasizing that the jury's verdict authorizes the maximum sentence in Michigan's indeterminate sentencing system. We further observed that the "Sixth Amendment ensures that a defendant will not be incarcerated for a term longer than that authorized by the jury upon a finding of guilt beyond a reasonable doubt." *Id*. at 163. Accordingly, "a defendant does not have a right to anything less than the maximum sentence authorized

22

by the jury's verdict, and therefore, judges may make certain factual findings to select a specific minimum sentence from within a defined range." *Id.* at 159.

> [I]n all but a few cases, a sentence imposed in Michigan is an indeterminate sentence. The maximum sentence is not determined by the trial court, but rather is set by law. Michigan's sentencing guidelines, unlike the Washington guidelines at issue in *Blakely,* create a range within which the trial court must set the minimum sentence. However, a Michigan trial court may not impose a sentence greater than the statutory maximum. While a trial court may depart from the minimum guideline range on the basis of "substantial and compelling reason[s]," MCL 769.34(3); *Babcock*, [469 Mich] at 256-258, such departures, with one exception, are limited by statute to a minimum sentence that does not exceed "⅔ of the statutory maximum sentence." MCL 769.34(2)(b). *Thus, the trial court's power to impose a sentence is always derived from the jury's verdict . . . .* [*Id.* at 161-162 (emphasis added) (second alteration in original).]

Not only did this Court recognize that a Michigan judge's exercise of discretion at sentencing is always derived from the jury's verdict, but it observed that the date chosen by the judge as the "minimum sentence" is merely a parole eligibility date:

> [T]here is no guarantee that an incarcerated person will be released from prison after the person has completed his or her minimum sentence. Ultimately, the parole board retains the discretion to keep a person incarcerated up to the maximum sentence authorized by the jury's verdict. Accordingly, because a Michigan defendant is always subject to serving the maximum sentence provided for in the statute that he or she was found to have violated, that maximum sentence constitutes the "statutory maximum" as set forth in *Blakely*. Therefore, we reaffirm our statement from *Claypool*, [470 Mich] at 730 n 14, that "the Michigan system is unaffected by the holding in *Blakely* that was designed to protect the defendant from a higher sentence based on facts not found by the jury in violation of the Sixth Amendment." [*Id.* at 163-164.]

Thus under *Drohan*, as long as a defendant has received a sentence within the statutory maximum, "a trial court may utilize judicially ascertained facts to fashion a sentence within the range authorized by the jury's verdict." *Id.* at 164.

This position is fully consistent with United States Supreme Court precedent: throughout all of that Court's decisions addressing the Sixth Amendment implications of judicial fact-finding at sentencing, it has *never* invalidated an indeterminate sentencing system or found that any indeterminate sentence was imposed in an unconstitutional manner on the basis of *Apprendi* or *Alleyne* considerations. Rather, it has expressly noted that indeterminate sentencing does not offend the Sixth Amendment. *Blakely*, 542 US at 308-309 (noting that in an indeterminate system, judicial fact-finding does not "pertain to whether the defendant has a legal *right* to a lesser sentence—and that makes all the difference insofar as judicial impingement upon the traditional role of the jury is concerned").

Thus both the United States Supreme Court and this Court have recognized that the distinction between indeterminate and determinate sentencing systems is not only consequential, but dispositive, in its Sixth Amendment implications for criminal sentencing. *Id.* This is because in an indeterminate system a criminal defendant is always subject to the statutory maximum punishment triggered by the jury's guilty verdict and as a result is restored to his or her "legal right" to freedom from incarceration only upon serving the entirety of that statutory maximum. The judge's exercise of judgment at sentencing is limited to assigning a minimum parole eligibility date, and even if a defendant is released on the very date he or she becomes eligible for parole, the defendant is still serving the punishment authorized by the jury's verdict. As a result, the judge's authority to fashion a minimum parole eligibility date does not affect the punishment imposed on a criminal defendant because it can never "expose the defendant

to a greater punishment than that authorized by the jury's verdict[.]" *Apprendi*, 530 US at 494.

In sum, Michigan has bifurcated the role of the judge and the jury; the jury is exclusively responsible-- consistently with the Sixth Amendment-- for determining at what moment a defendant will be fully restored to his or her "legal right" to freedom from incarceration. Once the jury decides that the elements have been proved beyond a reasonable doubt, a defendant is subject to serving the statutory maximum because he or she has no "legal right" to freedom from incarceration any sooner.[12] The Sixth Amendment affords a defendant no more, for it is not a panacea for the correction of all wrongs that some perceive within our sentencing system; recourse for some wrongs must be had through appeals to the people and their representatives in the Legislature. A sentence in Michigan is an indeterminate sentence in all but a few circumstances,[13] and as a result we have correctly held that our sentencing system is compatible with the Sixth Amendment. *Drohan*, 475 Mich at 143.

---

[12] "[A] defendant does not have a [constitutional] right to anything less than the maximum sentence authorized by the jury's verdict," and the Sixth Amendment only "ensures that a defendant will not be incarcerated for a term longer than that authorized by the jury upon finding of guilt beyond a reasonable doubt." *Drohan*, 475 Mich at 159, 163.

[13] Some examples of Michigan's "mandatory minimum" type of sentence include MCL 769.12(1)(a) (requiring a mandatory minimum sentence for a felon who has been convicted of certain felonies on three or more occasions), MCL 750.520b (requiring a mandatory minimum of 25 years for certain defendants convicted of first-degree criminal sexual conduct), MCL 750.227b (requiring a 2-year mandatory sentence for criminals who use firearms to commit or attempt to commit a felony), and MCL 750.316 (requiring a sentence of life without parole for persons convicted of first-degree murder). None of these statutes is at issue in this case.

## E. *ALLEYNE*

In 2013, the United States Supreme Court was called upon to revisit its holding in *Harris*, and once again it was faced with the question whether judicially ascertained facts that increase a "mandatory minimum" sentence should be encompassed within the rule of *Apprendi*. In *Alleyne*, the Supreme Court was faced with the same statute with which it had been earlier presented in *Harris*, but now reached a contrary conclusion about the statute's constitutionality, holding that "any fact that increases the mandatory minimum is an 'element' that must be submitted to the jury." *Alleyne*, 570 US at ___; 133 S Ct at 2155. In reaching this holding, the Supreme Court achieved two things: it overruled *Harris* and it extended the rule of *Apprendi* to judicially ascertained facts that increase "mandatory minimum" sentences.

*Alleyne*, like *Harris*, involved a defendant convicted of using or carrying a firearm while committing a violent crime in violation of 18 USC 924(c). This crime was punishable by a mandatory minimum sentence of five years, but if it was found that a defendant had "brandished" the weapon, the mandatory minimum sentence was to be increased to seven years. Although the jury itself was given the option to find "brandishing," it did not so find. *Id*. at ___; 133 S Ct at 2156. The judge, however, *did* find by a preponderance of the evidence that the defendant had "brandished" the weapon and consequently imposed a mandatory seven-year sentence. *Id*. at ___; 133 S Ct at 2156.

The Supreme Court held that such judicial fact-finding violated the Sixth Amendment. *Id*. at ___; 133 S Ct at 2155. The Court extended the rule of *Apprendi* to facts that increase "mandatory minimum" sentences because "there is no basis in

26

principle or logic to distinguish facts that raise the maximum from those that increase the [mandatory] minimum . . . ." *Id*. at ___; 133 S Ct at 2163.

> It is indisputable that a fact triggering a mandatory minimum alters the prescribed range of sentences to which a criminal defendant is exposed. . . . And because the legally prescribed range *is* the penalty affixed to the crime, it follows that a fact increasing either end of the range produces a new penalty and constitutes an ingredient of the offense.

> It is impossible to dissociate the floor of a sentencing range from the penalty affixed to the crime. Indeed, criminal statutes have long specified both the floor and ceiling of sentence ranges, which is evidence that both defined the legally prescribed penalty. . . . A fact that increases a sentencing floor, thus, forms an essential ingredient of the offense.

> Moreover, it is impossible to dispute that facts increasing the legally prescribed floor *aggravate* the punishment. Elevating the low-end of a sentencing range heightens the loss of liberty associated with the crime: the defendant's "expected punishment has increased as a result of the narrowed range" and "the prosecution is empowered, by invoking the mandatory minimum, to require the judge to impose a higher punishment than he might wish." [*Id.* at ___; 133 S Ct at 2160-2161 (citations omitted).]

In reaching this conclusion, the Court was careful to note that its holding did not prohibit "factfinding used to guide judicial discretion in selecting a 'punishment within the limits fixed by law.' " *Id*. at ___ n 2; 133 S Ct at 2161 n 2.

> Our ruling today does not mean that any fact that influences judicial discretion must be found by a jury. We have long recognized that broad sentencing discretion, informed by judicial factfinding, does not violate the Sixth Amendment. See, *e.g*., . . . *Apprendi*, 530 U.S., at 481 ("[N]othing in this history suggests that it is impermissible for judges to exercise discretion—taking into consideration various factors relating both to offense and offender—in imposing a judgment *within the range* prescribed by statute"). This position has firm historical roots as well. . . . Our decision today is wholly consistent with the broad discretion of judges to select a sentence within the range authorized by law. [*Id.* at ___; 133 S Ct at 2163 (citations omitted) (alteration in original).]

27

The Court noted that the rule of *Apprendi* applies with equal force to facts that increase mandatory minimum sentences because such judicial fact-finding alters the range of criminal punishment to which a criminal defendant is exposed and thus implicates the constitutional apportionment of authority between judge and jury. *Id*. at ___; 133 S Ct at 2163. In reaching this conclusion, the Court asserted that the *Apprendi* definition of criminal "elements" necessarily includes facts that increase the floor of the sentence. The Court stated that "[b]oth kinds of facts alter the prescribed range of sentences to which a defendant is exposed and do so in a manner that aggravates the punishment [in violation of the Sixth Amendment]."[14] *Id*. at ___; 133 S Ct at 2158.

## F. DEFENDANT'S ARGUMENT

Now that the United States Supreme Court has extended *Apprendi* to facts that increase "mandatory minimum" sentences, Michigan's sentencing system is once again challenged as unconstitutional under the Sixth Amendment. Specifically, defendant

---

[14] Chief Justice Roberts wrote in dissent on behalf of himself and two other justices. In his view, the majority erred by transforming the Sixth Amendment into "a protection for judges from the power of the legislature" even though the "Framers envisioned the Sixth Amendment as a protection for defendants from the power of the Government." *Alleyne*, 570 US at ___; 133 S Ct at 2168 (Roberts, C.J., dissenting). The dissent concluded that "the jury's verdict fully authorized the judge to impose a sentence of anywhere from five years to life in prison," and thus "[n]o additional finding of fact was 'essential' to any punishment . . . ." *Id*. at ___; 133 S Ct at 2169. Because "[t]he jury's verdict authorized the judge to impose the sentence he imposed for the precise factual reason he imposed it," the dissent believed the Sixth Amendment was not implicated. *Id*. at ___; 133 S Ct at 2170. Justice Alito also wrote in dissent, asserting that the majority erred by overruling "well-entrenched precedent with barely a mention of *stare decisis*." *Id*. at ___; 133 S Ct at 2172 (Alito, J., dissenting). He proceeded to counsel that "[i]f the Court is of a mind to reconsider existing precedent, a prime candidate should be *Apprendi* . . . ." *Id*. at ___; 133 S Ct at 2172.

contends that *Alleyne* renders Michigan's indeterminate sentencing guidelines unconstitutional because a criminal defendant's minimum sentence, i.e., his or her parole eligibility date, is determined in part on the basis of facts not found beyond a reasonable doubt by the jury. Although the majority is persuaded by this argument, I believe it is without merit. Accordingly, I would again sustain the Michigan sentencing guidelines as constitutional.

Initially, it is important to reiterate that Michigan's guidelines are a product of statute and consequently that this Court has a duty to presume their constitutionality, unless the lack of constitutionality is clearly apparent. *Taylor*, 468 Mich at 6. In this regard, I would emphasize that, in my view, today's decision is not compelled by the Sixth Amendment and Due Process Clause decisions of the United States Supreme Court, yet it overturns the specific will of the people of this state by negating *their* judgments, as reflected by the enactments of *their* Legislature, that the sentencing system of *their* state should be characterized by sentencing guidelines of an indeterminate character.[15] Striking down statutes that reflect such a considered judgment of the people and their representatives is something to be done only when the incompatibility of a state law with

---

[15] Indeed, Michigan amended its most recent Constitution to specifically enable indeterminate sentencing. See Const 1963, art 4, § 45 ("The legislature may provide for indeterminate sentences as punishment for crime and for the detention and release of persons imprisoned or detained under such sentences."); *Ughbanks v Armstrong*, 208 US 481, 485; 28 S Ct 372; 52 L Ed 582 (1908) ("An act providing for an indeterminate sentence was first passed in Michigan on July 1, 1889, and was declared unconstitutional . . . . A constitutional amendment was subsequently adopted (1901), which authorized the legislature to provide for an indeterminate sentence law, as punishment for crime, on conviction thereof.") (citations omitted).

29

the federal or state Constitution is manifest and our duty to preserve and maintain these charters of government is therefore directly and necessarily implicated. *Phillips v Mirac, Inc*, 470 Mich 415, 422; 685 NW2d 174 (2004) ("We exercise the power to declare a law unconstitutional with extreme caution . . . ."). That is precisely why we presume statutes to be constitutional and why we require a challenging party to demonstrate that a statute's lack of constitutionality is clearly apparent. *Cady v Detroit*, 289 Mich 499, 505; 286 NW 805 (1939).

Such a showing, in my judgment, has simply not been made in the present challenge. Defendant's position effectively seeks to have this Court recognize a new constitutional right to parole eligibility, a right so abstract and tentative that it can only be characterized as a "mere hope" to be released under the Sixth Amendment and the Due Process Clause. *Greenholtz v Inmates of Nebraska Penal & Correctional Complex*, 442 US 1, 11; 99 S Ct 2100; 60 L Ed 2d 668 (1979). The United States Constitution does not command that this Court recognize such a right, and consequently the will of the people with respect to criminal sentencing should *not* be overturned in this regard by the Court.[16]

The majority has erred, I believe, for two reasons. First, Michigan's sentencing system does not offend the Sixth Amendment, for reasons already stated, simply because ours is an "indeterminate" sentencing system. As noted, in Michigan the jury is always required to find the elements of a crime as a prerequisite to the imposition of criminal

---

[16] It should be emphasized that defendant has not raised a challenge under our state Constitution, choosing not to argue that it affords any greater or distinctive rights than the United States Constitution. Accordingly, our analysis here is confined to the latter, and I offer no opinion concerning the requirements of Michigan's own Constitution.

punishment, and as a result the authority of the judge in sentencing a criminal defendant to a term of incarceration within the limits of the statutory maximum for that crime does not infringe the authority of the jury. See *Blakely*, 542 US at 308 ("[The Sixth Amendment] limits judicial power only to the extent that the claimed judicial power infringes on the province of the jury"). Second, Michigan's sentencing system does not offend the Sixth Amendment because the guidelines simply do not produce anything resembling a "mandatory minimum" sentence. Because of this, *Alleyne* is simply inapplicable and adds nothing of relevance to the *Apprendi* and *Blakely* analyses, under which our sentencing system is altogether constitutional.

## 1. INDETERMINATE SENTENCING AND *ALLEYNE*

In *Drohan*, this Court made clear that Michigan's sentencing system does not offend the Sixth Amendment because it is an "indeterminate" sentencing system in which the authority of the judge cannot infringe upon the authority of the jury. *Drohan*, 475 Mich at 163. As a result, we held that the rule of *Apprendi* is inapplicable to Michigan's sentencing system. *Id*. Since *Drohan*, the only thing that has changed is the United States Supreme Court's issuance of *Alleyne*, and *Alleyne* does not in any way undermine this Court's holding in *Drohan*. Because *Alleyne* merely extended *Apprendi* to a new realm of criminal sentences that are largely nonexistent in Michigan, our sentencing system remains constitutional for the same reason that we held it to be constitutional in *Drohan*-- it is an indeterminate sentencing system.[17]

---

[17] Michigan still has an "indeterminate" sentencing system in which a judge cannot infringe the constitutional authority of the jury. Const 1963, art 4, § 45; *Drohan*, 475

31

A cursory review of *Alleyne* may lead some to believe that the distinction between indeterminate and determinate sentencing systems is no longer relevant in Sixth Amendment sentencing jurisprudence because the Supreme Court did not expressly refer to such a distinction in *Alleyne*. However, this overlooks that *Alleyne* merely extended the rule of *Apprendi*, a rule that *only* applies to determinate sentencing systems. *Blakely*, 542 US at 308-309; *Drohan*, 475 Mich at 160. As a result, the distinction between indeterminate and determinate sentencing systems remains relevant under the Sixth Amendment because, in a determinate system, the judge's sentence, and not the jury's verdict, determines a defendant's exposure to punishment, while in an indeterminate system, only the jury's verdict determines the defendant's exposure to punishment. Furthermore, in an indeterminate system such as Michigan's, the minimum sentence determined by the judge merely creates a right to a parole hearing-- a right that it is not even protected by the Constitution and therefore cannot form the predicate for a Sixth Amendment violation, as the majority believes. See *Greenholtz*, 442 US at 11.

Thus, the fundamental distinction between indeterminate and determinate sentencing systems remains relevant for Sixth Amendment purposes after *Alleyne*, and the absence of any express reference to the distinction in that case is neither here nor there. *Blakely*, 542 US at 308-309. There is simply no compelling reason why the Supreme Court would have thought it necessary in *Alleyne* to restate a distinction

---

Mich at 163. The jury is charged with finding each of the elements necessary to ultimately determine at what moment a defendant's "legal right" to freedom from incarceration will be restored. The Sixth Amendment affords a criminal defendant nothing more.

thoroughly addressed in its earlier decisions. The Court had already made it abundantly clear that

> the Sixth Amendment by its terms is not a limitation on judicial power, but *a reservation of jury power*. It limits judicial power only to the extent that the claimed judicial power infringes on the province of the jury. *Indeterminate sentencing does not do so.* [*Blakely*, 542 US at 308-309 (emphasis added).]

If it had been the intention of *Alleyne* to alter or undermine an analysis previously set forth in *Apprendi* and *Blakely*, one would presume that *Alleyne* would have affirmatively stated its intentions to *alter* what had been made clear in *Apprendi* and *Blakely* concerning the Sixth Amendment significance of indeterminate sentences. There is simply nothing in *Alleyne* that logically undermines the Supreme Court's earlier-stated distinction between determinate and indeterminate sentences, much less anything that so *clearly* obviates these already-stated distinctions, that *silence* on the part of the Court should now reasonably be understood as effecting a major change in the constitutional treatment of the sentencing systems of a significant number of states of the Union.[18] There is simply no reasonable understanding of *Alleyne* that would place a burden on the Court to affirmatively articulate an intention to *sustain* an existing constitutional rule if

---

[18] In 1996, according to the Bureau of Justice Statistics (BJS), 36 states, including Michigan, and the District of Columbia had adopted some form of indeterminate sentencing. Bureau of Justice Assistance, *1996 National Survey of State Sentencing Structures* (1998), pp 4-5 <https://www.ncjrs.gov/pdffiles/169270.pdf> (accessed July 21, 2015) [http://perma.cc/34R3-WPYH]. To distinguish between systems with indeterminate and determinate sentencing schemes, the BJS considered whether parole release remained available for a significant fraction of cases. *Id*. at 1-2. The 14 states identified as having determinate sentencing were all states that had eliminated parole release. *Id*. at 1.

33

that was the Court's intention, as I believe it to have been. Indeed, exactly the opposite burden would seem to obtain-- a burden on the Court to affirmatively articulate its intention to *repudiate* an existing constitutional rule-- before effecting a sea change in the constitutional treatment of state criminal justice practices.

Furthermore, it would make little sense to abandon the distinction between indeterminate and determinate sentencing systems under the Sixth Amendment because the judge in an indeterminate system merely assigns a criminal defendant's parole eligibility date, which does not implicate the Sixth Amendment. This is why the range in a determinate system is the focus of *Apprendi* and *Alleyne* because in those systems, the authority to impose criminal punishment rests with the judge. A judge exercising that power must respect both the top of the range set by the jury's verdict (*Apprendi*) and the bottom of the range set by the jury's verdict (*Alleyne*). In Michigan's indeterminate system, however, the jury's verdict sets a single number-- the statutory maximum-- and the judge must impose a minimum punishment below the limit set by that number.[19] Although the Legislature mandates that courts be authorized to increase the parole

---

[19] This is identical to the common-law sentencing system discussed favorably in a part of Justice Thomas's opinion in *Alleyne* that only Justices Ginsburg, Sotomayor, and Kagan joined:

> At common law, the relationship between crime and punishment was clear. As discussed in *Apprendi,* "[t]he substantive criminal law tended to be sanction-specific," meaning "it prescribed a particular sentence for each offense." The system left judges with little sentencing discretion: once the facts of the offense were determined by the jury, the "judge was meant simply to impose [the prescribed] sentence." [*Alleyne*, 570 US at ___; 133 S Ct at 2158 (citations omitted) (alterations in original).]

eligibility date, *Alleyne*, like *Apprendi*, concerns the authority flowing from the jury's verdict and not the discretion of a judge.[20] *Alleyne* makes this clear, as judges are free to find facts as long as it does not alter the range of permissible limits of punishment set by the jury's verdict. *Alleyne*, 570 US at ___; 133 S Ct at 2163.

By implementing a parole system, our Legislature has given a convicted criminal the opportunity for release before serving his or her statutory maximum. It is important

---

[20] The majority believes that "after *Alleyne*, the Legislature may not require judicial fact-finding that results in a mandatory increase in *either* the minimum or the maximum sentence beyond the range set by the jury verdict." To support this, it relies on the *Alleyne* dissent of Chief Justice Roberts. First and most obviously, the Chief Justice's comments are in a dissent and thus not controlling. Second, this dissent states that the statute requiring the trial court to raise defendant's minimum sentence from 5 to 7 years if it determines that the defendant brandished a firearm "has no effect on the role of the jury." *Id.* at ___; 133 S Ct at 2168 (Roberts, C.J., dissenting). The majority in *Alleyne* seems to have found this statement to be incorrect given that it reached the opposite conclusion, holding that allowing the trial court to alter the sentence range on the basis of its own factual finding *did* have an "effect on the role of the jury" because while the "range supported by the jury's verdict was five years' imprisonment to life," the statute precluded the trial court from considering that range and instead required it to consider only the range of seven years' imprisonment to life. *Alleyne* held that the *jury* must make all factual findings that authorize the prescribed sentence range and because the statute allowed the *judge* to make findings that altered the range, the defendant's Sixth Amendment right to a jury trial had been violated. Furthermore, *Alleyne* had no apparent difficulty with the legislature's *requiring* the trial court to sentence the defendant to a term of at least 5 years, despite the fact that such a mandatory minimum was what most obviously limited the discretion of the judiciary in the first place. Moreover, the *Alleyne* majority also had no difficulty with the legislature's requiring the trial court to sentence the defendant to at least 7 years when he brandished a firearm. Its only difficulty was with having the trial court, rather than the jury, *find* that the defendant had brandished a firearm. In other words, the majority seemed little concerned that the legislature was requiring the trial court to sentence the defendant to a mandatory minimum and thus curtailing the court's own discretion. Instead, it was concerned only that the court itself had decided a matter that altered the permissible sentence limit set by the jury's verdict and thereby aggravated the punishment.

to note, however, that parole is not a constitutionally mandated procedure and rights or interests assertedly stemming from its operations are not generally viewed as being of constitutional dimension. *Greenholtz*, 442 US at 7 ("There is no constitutional or inherent right of a convicted person to be conditionally released before the expiration of a valid sentence. . . . A state may . . . establish a parole system, but it has no duty to do so."). To be sure, a delay in the right to a parole hearing might well have considerable effect on the interest of a criminal defendant. Any such interest, however, ultimately reflects a mere *hope* or aspiration that some personal gain or advantage will result from a hearing, and thus the interest has not been viewed as sufficiently concrete or developed to be entitled to constitutional protection under the Due Process Clause. *Id.* at 11 (stating that an asserted interest in the possibility of parole is "no more substantial than an inmate's hope that he will not be transferred to another prison, a hope which is not protected by due process"). While a criminal defendant may understandably view the denial of parole eligibility as part of the "punishment" imposed on him by the court, Michigan law makes clear that this is *not* the case.[21] MCL 791.238. For that reason, a criminal defendant is not entitled under our Constitution to a jury determination of any fact relied on by a judge to set the defendant's parole eligibility date because those facts

---

[21] Further, it would make little sense to hold that an increase in the amount of time a prisoner must wait before becoming eligible for parole constitutes an increase in criminal punishment because that understanding would also require facts found by the Parole Board to deny parole to be instead found by jury. The Supreme Court, however, has squarely rejected this understanding. *Greenholtz*, 442 US at 11.

do not "expose the defendant to a greater punishment than that authorized by the jury's verdict[.]"[22] *Apprendi*, 530 US at 494.

The United States Supreme Court has held only that an inmate possesses certain due process rights with respect to parole *revocation* procedures-- that is, rights arising *after* the inmate has been conditionally granted at least some freedom from incarceration. It is only at this time that an individual possesses more than a hope that a benefit will be obtained. Even in this regard, however, there is no right to a jury determination of facts relevant to a decision to *revoke* good-time credits that have presumably already been obtained by, or conferred upon, an inmate.[23] Finally, the Court has not required a jury at any type of parole proceeding, including a parole-revocation proceeding,[24] and it has not

---

[22] Even if a jury *were* somehow required to determine these facts, they would not have to be proved beyond a reasonable doubt since due process has never been applied to protect a mere "asserted interest in the possibility of parole." *Id*.

[23] *Wolff v McDonnell*, 418 US 539, 556-571; 94 S Ct 2963; 41 L Ed 2d 935 (1974) (holding that although revocation of good-time credits implicates due process because of its depriving an inmate of a cognizable liberty interest, the parole board may revoke good-time credits without impaneling a jury under the Sixth Amendment).

[24] *Morrissey v Brewer*, 408 US 471, 484; 92 S Ct 2593; 33 L Ed 2d 484 (1972) (holding that a criminal defendant has certain due process rights when his or her partial liberty granted through the parole board is revoked). When discussing what specific process is due, the Court required the following:

> (a) written notice of the claimed violations of parole; (b) disclosure to the parolee of evidence against him; (c) opportunity to be heard in person and to present witnesses and documentary evidence; (d) the right to confront and cross-examine adverse witnesses (unless the hearing officer specifically finds good cause for not allowing confrontation); (e) a "neutral and detached" hearing body such as a traditional parole board, members of which need not be judicial officers or lawyers; and (f) a written statement

37

required the parole board itself to apply a "beyond a reasonable doubt" standard to the facts on which it is relying. *Greenholtz*, 442 US at 14-15.

Furthermore, the Court has never required a jury in a parole proceeding because, although parole proceedings can implicate *due process* concerns, they do not implicate a defendant's right to a *jury trial* under the Sixth Amendment.[25]  The Sixth Amendment

---

by the factfinders as to the evidence relied on and reasons for revoking parole. [*Id.* at 489.]

It is noteworthy that the Court did not require a jury to determine any fact, or any fact to be proved, beyond a reasonable doubt.  This is because a parole proceeding is simply not a "criminal" prosecution, as the Court went on to state:

We emphasize there is no thought to equate this second stage of parole revocation to a criminal prosecution in any sense.  It is a narrow inquiry; the process should be flexible enough to consider evidence including letters, affidavits, and other material that would not be admissible in an adversary criminal trial. [*Id.*]

[25] The majority views United States Supreme Court decisions addressing parole eligibility as inapplicable to the present analysis because they concern only the Due Process Clause.  Because *Alleyne* and *Apprendi* pertain to both the Sixth Amendment and the Due Process Clause, the majority believes that decisions addressing only one of these rights are irrelevant.  Under this rationale, any decision addressing more than a single constitutional right apparently can only provide guidance in a later case addressing the identical combination of constitutional rights.  This argument is meritless, in my judgment.  The Supreme Court's parole eligibility decisions under the Due Process Clause are relevant to the present analysis for the simple reason that this same Due Process Clause *is again at issue in the present case and in the identical context, the constitutional relevance of the parole decision*.  Indeed, the Supreme Court in *Apprendi* framed the issue as one dealing *exclusively* with the Due Process Clause.  *Apprendi*, 530 US at 469 ("The question presented is whether the *Due Process Clause* of the Fourteenth Amendment requires that a factual determination authorizing an increase in the maximum prison sentence for an offense from 10 to 20 years be made by a jury on the basis of proof beyond a reasonable doubt.") (emphasis added).  The majority's error in choosing to ignore this line of precedent will become increasingly apparent when this Court must specifically *rely* on it precisely to address challenges to parole eligibility that will almost

does not protect a criminal defendant's hopes or aspirations to be released sooner than he or she is lawfully entitled, nor does it require any fact relevant to a parole proceeding to be proved either by a jury or beyond a reasonable doubt.[26] In Michigan in particular, it is beyond debate that the jury is exclusively responsible for determining at what moment a criminal defendant's "legal right" to freedom from punishment will be restored.[27] Any judicial authority relating exclusively to selecting a parole eligibility date, and any right arising from the operation of the parole system, implicates rights that are not protected by the Sixth Amendment. As far as the Sixth Amendment is concerned, a criminal defendant in Michigan has been given everything to which the defendant is

---

certainly follow in the wake of the present decision. If a judge's increase in a defendant's minimum parole eligibility date constitutes an increase in "punishment," as the majority now asserts, so too seemingly is the parole board's decision to deny parole. Contra *Greenholtz*, 442 US at 11; *Morrissey*, 408 US at 484. Furthermore, it is clear the Supreme Court *did* impliedly give consideration to the Sixth Amendment in its parole decisions, as it stated that the decision to delay or deny parole *can* be made by a "neutral and detached hearing body such as a traditional parole board, members of which need not be judicial officers or lawyers." *Morrissey*, 408 US at 489.

[26] See *Greenholtz*, 442 US at 7 ("Decisions of the Executive Branch, however serious their impact, do not automatically invoke due process protection; there simply is no constitutional guarantee that all executive decisionmaking must comply with standards that assure error-free determinations. . . . This is especially true with respect to the sensitive choices presented by the administrative decision to grant parole release."); *Morrissey*, 408 US at 489 (holding that due process at parole revocation proceedings require "a 'neutral and detached' hearing body such as a traditional parole board, members of which need not be judicial officers or lawyers").

[27] A defendant is only legally entitled to be freed from punishment upon serving the statutory maximum sentence. The defendant may be released from the punishment imposed pursuant to the jury's verdict sooner than this date, but the decision to free a prisoner from his or her punishment remains always a discretionary decision within the authority of the Parole Board.

constitutionally entitled after a jury of his or her peers has returned a verdict and subjected the defendant to serve the statutory maximum punishment. The jury is exclusively responsible for authorizing the limits of criminal punishment, and the judge cannot infringe that power. Thus, the process of scoring prior record and offense variables to set the minimum parole eligibility date constitutes a valid exercise of judicial authority that does not violate or even implicate the Sixth Amendment.

## 2. "MANDATORY MINIMUM" SENTENCES

Michigan's sentencing guidelines also fall outside the scope of *Alleyne* because they simply do not give rise to the "mandatory minimum" sentences that are the focus of that opinion. Again, the critical holding of *Alleyne* is that any fact that increases the mandatory minimum constitutes an "element" that must be determined by the jury. *Alleyne*, 570 US at ___; 133 S Ct at 2155. By its straightforward terms, *Alleyne* only pertains to facts that increase "mandatory minimum" sentences.

A "mandatory minimum" sentence is one that requires a sentencing court to impose a statutorily fixed minimum term of incarceration for a particular crime when certain statutory criteria have been satisfied. Concerning these types of sentences, "[t]he offender's personal background, the facts of his case, and all other details become [otherwise] irrelevant." Luna, *Gridland: An Allegorical Critique of Federal Sentencing*, 96 J Crim L & Criminology 25, 66-67 (2005). For example, the defendant in *Alleyne* was sentenced under a statute with a 5-, 7-, or 10-year "mandatory minimum" sentence, providing as follows:

> (c)(1)(A) Except to the extent that a greater minimum sentence is otherwise provided by this subsection or by any other provision of law, any person who, during and in relation to any crime of violence or drug

trafficking crime . . . for which the person may be prosecuted in a court of the United States, uses or carries a firearm, or who, in furtherance of any such crime, possesses a firearm, shall, in addition to the punishment provided for such crime of violence or drug trafficking crime--

(i) be sentenced to a term of imprisonment of *not less than 5 years*;

(ii) if the firearm is brandished, be sentenced to a term of imprisonment of *not less than 7 years*; and

(iii) if the firearm is discharged, be sentenced to a term of imprisonment of *not less than 10 years*. [18 USC 924 (emphasis added).]

Michigan *does* have several genuinely "mandatory minimum" sentences, but we do not have a single statute that operates in the fashion of the statute in *Alleyne*. See note 13 of this opinion. Of the very few "mandatory minimum" sentences in Michigan, none allows judicial fact-finding to increase the "mandatory minimum" sentence established by the statute and none, of course, is at issue in the present case.

Outside these few statutes, criminal defendants in Michigan are given a minimum sentence as a function of a guidelines calculation of prior record and offense variables, and that minimum sentence represents the earliest time at which a defendant can petition the Parole Board for release. The defendant has no "legal right" to freedom from incarceration before serving the statutory maximum sentence. *Drohan*, 475 Mich at 163-164; *Greenholtz*, 442 US at 7 ("There is no constitutional or inherent right of a convicted person to be conditionally released before the expiration of a valid sentence."). The guidelines are in place largely to assist the judge in establishing an appropriate parole eligibility date in the individual case. MCL 791.233.

If a criminal defendant in Michigan is charged under a statute that has a "mandatory minimum," the judge cannot depart below that sentence. MCL 769.34

41

Because a "mandatory minimum" cannot be departed from, no matter what aggravating or mitigating circumstances may be presented to the court, it is clear that a "mandatory minimum" sentence and a "guidelines minimum" sentence are two very distinct sanctions in our justice system, for the simple reason that one is mandatory and the other is not.[28] Under MCL 769.34, guidelines ranges are formally labeled as "recommended minimum sentence ranges," not "mandatory minimum" sentences, and "mandatory minimum" sentences are generally referred to as such.[29] Because "recommended minimum sentence ranges" are not the equivalent of "mandatory minimum" sentences in Michigan, judicial

---

[28] This distinction has been acknowledged by justices of the United States Supreme Court. See, e.g., *Harris*, 536 US at 570-571 (Breyer, J., dissenting) ("Unlike Guideline sentences, statutory mandatory minimums generally deny the judge the legal power to depart downward, no matter how unusual the special circumstances that call for leniency.").

[29] MCL 769.34(2)(a), for example, provides:

> If a statute *mandates a minimum sentence* for an individual sentenced to the jurisdiction of the department of corrections, the court shall impose sentence in accordance with that statute. Imposing a *mandatory minimum* sentence is not a departure under this section. If a statute *mandates a minimum sentence* for an individual sentenced to the jurisdiction of the department of corrections and the statute authorizes the sentencing judge to depart from that *minimum sentence*, imposing a sentence that exceeds the recommended sentence range but is less than the *mandatory minimum* sentence is not a departure under this section. If the Michigan vehicle code, 1949 PA 300, MCL 257.1 to 257.923, *mandates a minimum* sentence for an individual sentenced to the jurisdiction of the department of corrections and the Michigan vehicle code, 1949 PA 300, MCL 257.1 to 257.923, authorizes the sentencing judge to impose a sentence that is less than that *minimum sentence*, imposing a sentence that exceeds the recommended sentence range but is less than the *mandatory minimum* sentence is not a departure under this section. [Emphasis added.]

fact-finding employed to score the guidelines is permissible under the Sixth Amendment.[30]

Defendant urges this Court to abandon this traditional distinction in light of the United States Supreme Court's statements in *Booker* regarding sentencing departures. In *Booker*, the Court rejected the prosecution's argument that, because the statute in that case permitted a maximum sentence beyond the guidelines range, the determinate federal guidelines range in dispute did not produce a "statutory maximum" under *Apprendi*. The Court rejected this argument, stating:

> The availability of a departure in specified circumstances does not avoid the constitutional issue, just as it did not in *Blakely* itself. The Guidelines permit departures from the prescribed sentencing range in cases in which the judge "finds that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that should result in a sentence different from that described." 18 U.S.C. § 3553(b)(1) (2000 ed., Supp. IV). At first glance, one might believe that the ability of a district judge to depart from the Guidelines means that she is bound only by the statutory maximum. Were this the case, there would be no *Apprendi* problem. *Importantly, however, departures are not available in every case*, and in fact are unavailable in most. In most cases, as a matter of law, the Commission will have adequately taken all relevant factors into account, and no departure will be legally permissible. In those instances, the judge is bound to impose a sentence within the Guidelines range. [*Booker*, 543 US at 284 (emphasis added).]

---

[30] Thus, fact-finding by a Michigan judge fits within the "broad sentencing discretion" belonging to that judge that does not violate the Sixth Amendment. See *Alleyne*, 570 US at ___; 133 S Ct at 2163 (" '[E]stablishing what punishment is available by law and setting a specific punishment within the bounds that the law has prescribed are two different things.' Our decision today is wholly consistent with the broad discretion of judges to select a sentence within the range authorized by law.") (citations omitted) (alteration in original).

43

It is argued here that this language, coupled with *Alleyne*, renders the Michigan guidelines unconstitutional. I do not agree.

First of all, anything the Supreme Court has said about upward departures in a determinate system cannot reflexively be applied to an indeterminate system. A departure in a determinate system *can* result in a criminal defendant being deprived of his or her "legal *right* to a lesser sentence." This is because the judge ultimately has the authority to choose at what moment this "legal right" to freedom from incarceration will be restored, and if the judge chooses a date beyond that authorized by the jury's verdict, the defendant is necessarily deprived of his or her legal right to a maximum sentence determined by the jury's verdict.[31] This is not true in an indeterminate system because the judge in such a system does not have the authority to determine at what moment a defendant's "legal right" to freedom from incarceration will be restored, nor does the judge have any authority to extend the minimum parole eligibility date beyond the statutory maximum sentence.

Second, this same argument was made in *Drohan* regarding the "statutory maximum" under *Blakely* and *Apprendi*, and this Court rejected it on the grounds that our

_____

[31] Take the defendant in *Jones*, for example. He was found guilty of a crime that carried a 15-year maximum sentence. *Jones*, 526 US at 231. When the judge found an additional fact-- that the victim had suffered substantial bodily injury-- it was required to sentence the defendant to a 25-year term. *Id*. Thus, the judge was able to sentence the defendant beyond the limit authorized by the jury's verdict and accordingly could deprive him of his "legal *right* to a lesser sentence." This simply cannot happen in an indeterminate system because a defendant is always subject to serving the maximum sentence and the judge can never interfere with this imposition of criminal punishment.

44

system is indeterminate and thus distinct from those at issue in *Apprendi* and *Blakely*. *Drohan*, 475 Mich at 163-164. If the above passage from *Booker* was not read at that time to render our guidelines unconstitutional under *Apprendi*, it surely cannot now be read to render our system unconstitutional under *Alleyne*, as *Alleyne* merely extended *Apprendi* to a new category of sentences into which the instant sentence does not fall. Reliance on *Booker* in the instant case is misplaced for the identical reasons that this Court has already explained in *Drohan*:

> Defendant asserts that the "maximum-minimum" under the guidelines constitutes the "statutory maximum" for *Blakely* purposes because a trial court is required to depart on the basis of a finding of aggravating factors that, as a practical matter, will subject the defendant to an increase in the actual time the defendant will be required to serve in prison. However, defendant's interpretation is inconsistent with the nature of the protection afforded by the Sixth Amendment. At common law, a jury's verdict entitled a defendant to a determinate sentence. During the 19th century, American courts began moving away from such sentencing by according trial courts the discretion to determine a defendant's sentence. However, this new discretion was limited by fixed statutory or constitutional limits. In other words, while a trial court could impose a sentence *less than* the maximum authorized by the jury's verdict, the court could not impose a sentence greater than that allowed by the statute that the defendant had been convicted of violating. In short, the Sixth Amendment ensures that a defendant will not be incarcerated for a term longer than that authorized by the jury upon a finding of guilt beyond a reasonable doubt. However, the Sixth Amendment does not entitle a defendant to a sentence *below* that statutory maximum. Rather, under the Sixth Amendment, the jury effectively sets the outer limits of a sentence and the trial court is then permitted "to exercise discretion—taking into consideration various factors relating both to offense and offender—in imposing a judgment within the range prescribed by statute."

> When defendant, a third-offense habitual offender, committed third-degree criminal sexual conduct, he did so knowing that he was risking 30 years in prison. When defendant was, in fact, sentenced to a maximum of 30 years in prison, he received all the protections he was entitled to under the Sixth Amendment. Therefore, the trial court's exercise of discretion in

45

imposing a sentence greater than the "maximum-minimum," but within the range authorized by the verdict, fully complies with the Sixth Amendment. [*Drohan*, 475 Mich at 162-163 (citations omitted).]

For each of these reasons, it seems clear that Michigan's sentencing guidelines do not produce "mandatory minimum" sentences and therefore are unaffected by *Alleyne*.

It may also be relevant to note that I am not alone in reaching this conclusion. Each of the 11 federal courts of appeals to rule on this issue has held that judicial fact-finding does not implicate *Alleyne* if there is no "mandatory minimum" sentence involved.[32] And in each of these cases, the court has found *Alleyne* inapplicable when

---

[32] See *United States v Ibrahim,* 529 F Appx 59, 64 (CA 2, 2013) ("Because the Sentencing Guidelines are advisory rather than mandatory, application of guidelines enhancements that do not increase the statutory maximum or minimum penalty neither implicates nor violates a defendant's Sixth Amendment right to a jury trial.") (citation omitted); *United States v Tuma*, 738 F3d 681, 693 (CA 5, 2013) ("[Defendant's] sentence did not expose him to a mandatory minimum sentence and was well within the sentencing discretion of the district court; therefore, *Alleyne* is inapplicable."); *United States v Johnson,* 732 F3d 577, 583-584 (CA 6, 2013) (holding that judicial fact-finding of crack cocaine quantity does not violate *Alleyne* rule because it does not alter a mandatory minimum sentence); *United States v Baum,* 542 F Appx 724, 727 (CA 10, 2013) (holding that the district court's fact-finding for guidelines purposes, without altering the mandatory minimum, was permissible under *Alleyne*); *United States v Ramírez-Negrón*, 751 F3d 42, 49 (CA 1, 2014) ("We flatly reject the proposition that all drug quantity calculations made under the advisory Guidelines must be submitted to a jury. . . . No *Alleyne* error occurs when a defendant's sentence is based entirely on Guidelines considerations without changing the applicable mandatory minimum."); *United States v Robinson*, 556 F Appx 68, 70 (CA 3, 2014) (holding that the district court "retained the ability to make factual findings necessary to calculate [the defendant's] advisory Sentencing Guidelines range" without submitting those questions to a jury); *United States v Holder,* 549 F Appx 214, 215 (CA 4, 2014) ("[A]lthough judicially determined facts are no longer relevant after *Alleyne* to deciding the applicable mandatory minimum, the factual findings needed to calculate a defendant's advisory Guidelines range are still within the district court's province."); *United States v Valdez,* 739 F3d 1052, 1054 (CA 7, 2014) (holding that when "[t]here is no indication . . . that the district judge thought her sentencing discretion was cabined by a higher statutory minimum" than that supported by

judicial fact-finding is merely used to score guidelines and does not result in an increased "mandatory minimum" sentence. Although the courts of appeals have sometimes overturned sentences under *Alleyne*, on each occasion it was done because the statute under which the defendant was convicted allowed judicially ascertained facts to justify an increase in the statutory "mandatory minimum," as in *Alleyne* itself.[33] No court of appeals has held *Alleyne* to be applicable to judicial fact-finding used to score guidelines.

---

the drug quantities charged or admitted by the defendant, the district court's calculation of "a greater drug quantity solely for purposes of determining [the defendant's] Guideline range" did not violate *Alleyne* rule); *United States v Battle*, 774 F3d 504, 516 (CA 8, 2014) (stating that "[i]n applying the [sentencing] enhancement, the court neither exceeded the statutory maximum nor increased a statutory mandatory minimum" and "[t]hus the court did not err in conducting its own fact-finding for the purposes of applying the enhancement"); *United States v Lizarraga-Carrizales*, 757 F3d 995, 998 (CA 9, 2014) (" '*Alleyne,* by its terms, applies to facts that "increase[ ] the mandatory minimum." [The defendant] suggests that *Alleyne* applies more broadly . . . . We do not read *Alleyne* so expansively. A fact that precludes safety-valve relief does not trigger or increase the mandatory minimum, but instead prohibits imposition of a sentence below a mandatory minimum already imposed as a result of the guilty plea or jury verdict.' "), quoting *United States v Harakaly*, 734 F3d 88, 98 (CA 1, 2013) (alterations in original); *United States v Cassius*, 777 F3d 1093, 1099 (CA 10, 2015) (upholding a district court's imposition of a mandatory minimum sentence when "the court made clear elsewhere at sentencing . . . that only one count required a mandatory minimum," stating that "[m]ost importantly, the Court explicitly discussed *Alleyne* at sentencing [and] noted that it *only applied where mandatory minimum sentences were increased due to judicial fact-finding*") (emphasis added); *United States v Charles*, 757 F3d 1222, 1225 (CA 11, 2014) (holding that "a district court may continue to make guidelines calculations based upon judicial fact findings and may enhance a sentence—so long as its findings do not increase the statutory maximum or [mandatory] minimum authorized by facts determined in a guilty plea or jury verdict"). While I recognize that these are federal cases and none, of course, deals specifically with an application of *Alleyne* to Michigan's sentencing system, each circuit has simply examined whether there was a mandatory minimum in the traditional sense, and when it was determined that there was no such mandatory minimum, that was the end of the analysis.

[33] See e.g., *United States v Lara-Ruiz*, 721 F3d 554 (CA 8, 2013) (remanding for

In summary, the trial court in the instant case did not violate the Sixth Amendment by scoring defendant's offense variables under a "preponderance of the evidence" standard. As *Alleyne* made clear:

> Our ruling today does not mean that any fact that influences judicial discretion must be found by a jury. We have long recognized that broad sentencing discretion, informed by judicial fact-finding, does not violate the Sixth Amendment. [*Alleyne*, 570 US at ___; 133 S Ct at 2163.]

Because a Michigan trial court's exercise of judgment at sentencing falls within the "broad sentencing discretion, informed by judicial fact-finding," defendant here is not entitled to be resentenced because his sentence fully comported with the requirements of the Sixth Amendment.

## IV. RESPONSE TO THE MAJORITY

The majority believes that *Alleyne* altered the Sixth Amendment landscape established by *Apprendi* by holding merely that the "*Apprendi* rule applied with equal force to minimum sentences." Michigan's sentencing guidelines thereby fail under *Apprendi* because the "guidelines used to set the minimum sentence require a court to increase a defendant's minimum sentence beyond the minimum sentence authorized by the jury's verdict alone." As a result, "under *Alleyne*, the Legislature may not require judicial fact-finding that results in a mandatory increase in *either* the minimum or maximum sentence beyond the range set by the jury verdict." This is because the right to

---

resentencing when judicially found facts were used to increase a mandatory minimum sentence from 5 to 7 years under 18 USC 924(c)); *United States v Hackett*, 762 F3d 493 (CA 6, 2014); *United States v Lira*, 725 F3d 1043 (CA 9, 2013).

48

a jury trial includes "the right to have a 'jury determination' of all the pertinent facts used in *increasing the prescribed range of penalties*."

Although I agree that trial judges in our state find facts that increase a prescribed range and do so in a manner that can be considered "mandatory," this cannot be the end of the analysis. *Alleyne* indeed extended the rule of *Apprendi* to mandatory minimum sentences, and thus we must apply that rule to our sentencing system to determine whether the judge is finding "elements" that must be found by the jury and found beyond a reasonable doubt. The majority, however, does not actually apply *Apprendi* to our sentencing system, and it does not actually explain why an increase in the guidelines range somehow increases the "punishment" imposed on a criminal defendant. By simply assuming that *Apprendi* applies to our system because it is "mandatory," and then by further assuming that an extension of the period before a defendant first becomes eligible for parole is tantamount to an increase in "punishment," the majority errs, in my view, by concluding that our sentencing system is unconstitutional.

The instant case involves the right to a jury trial, and this right is the product of both the Sixth Amendment and the Due Process Clause. Whether our sentencing system is constitutional cannot be answered by this Court exclusively on the basis of the text of these provisions. Rather, we must rely on the analyses set forth in two lines of United States Supreme Court decisions: the first is the line of cases including *Apprendi* and its progeny and the second is the line of cases encompassing the Court's analysis of the constitutional implications of parole under the Due Process Clause. This scope of analysis should not come as a surprise in light of the explicit recognition in *Apprendi* and

*Alleyne* that the *Alleyne* rule is a function of both the Sixth Amendment and the Due Process Clause.[34]

The majority finds inapplicable the latter line of cases because they do not also involve the Sixth Amendment. See note 25 of this opinion. This holding cuts directly against the Supreme Court's Due Process precedents, for if an increase in a defendant's minimum parole eligibility date constitutes an increase in "punishment," so too does a denial of parole by the Parole Board. Criminal defendants as a result of today's decision will soon be proceeding en masse to challenge any denial or delay of parole as a violation of their "*Lockridge*" rights, and when they do, the majority will again have to decide whether Supreme Court decisions such as *Greenholtz*[35] and *Morrissey*[36] are relevant in ruling on those appeals. Only then will it become apparent how critical these decisions are, not only for the *Lockridge* cases of tomorrow, but also for the *Lockridge* case that is before us today. The majority has dismissed *Greenholtz* and *Morrissey* in today's case, but they will not be able to dismiss them tomorrow when today's decision must be given application in the context of countless individual appeals.

---

[34] "At stake in this case are constitutional protections of surpassing importance: the proscription of any deprivation of liberty without 'due process of law,' [US Const] Amdt. 14, and the guarantee that '[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury, [US Const] Amdt. 6.' " *Apprendi*, 530 US at 476-477(second alteration in original). "The Sixth Amendment provides that those 'accused' of a 'crime' have the right to a trial 'by an impartial jury.' This right, in conjunction with the Due Process Clause, requires that each element of a crime be proved to the jury beyond a reasonable doubt." *Alleyne*, 570 US at ___; 133 S Ct at 2156.

[35] *Greenholtz*, 442 US 1.

[36] *Morrissey*, 408 US 471.

50

In the Supreme Court's Due Process Clause jurisprudence, there is a line of cases addressing constitutional rights associated with parole and parole eligibility. Because judges in Michigan, in implementing our sentencing guidelines, bear the responsibility of setting a defendant's earliest parole eligibility date, it is obvious that this line of Supreme Court cases would not only not be *instructive* in applying the rule of *Apprendi*, but would be *particularly* instructive for this purpose. This is because a judge's extension of the period before a defendant first becomes eligible for parole is the equivalent of a parole board's finding facts that operate to deny parole.[37] If the Supreme Court believed that a parole-eligibility determination by the trial judge constituted an increase in a defendant's "punishment," the Court would also have required facts relied on by a parole board to make this same determination to be found instead by a jury. This is emphatically not the case, however, because the Supreme Court has held that a person has no due process rights with respect to parole eligibility, and it has rejected the argument that a parole board must empanel a jury to determine whether to grant or deny parole. *Greenholtz*, 442 US at 11; *Morrissey*, 408 US at 489. From these holdings, it is apparent that the Court does not view decisions concerning a defendant's parole eligibility as tantamount to an increase in "punishment."

From the *defendant's* perspective, we may be able to understand this distinctive sense of "punishment" served while incarcerated and "punishment" served while on parole. But the relevant perspective for this Court is not that of the defendant but that of

---

[37] Each decision results in a convicted person being required to serve a greater or lesser part of his or her overall punishment in prison.

the Constitution, and the Supreme Court has made clear that under the Constitution, a defendant has no right to parole and serves his or her "punishment" both while in prison and while on parole. *Greenholtz*, 442 US at 11. Because a defendant might well prefer to spend a part of his or her overall punishment on parole rather than in prison does not mean that a judicial increase in the period before the defendant becomes eligible to serve that punishment on parole constitutes an increase in the "punishment" authorized by the jury's verdict. The Supreme Court has never treated the denial or delay in parole eligibility as the equivalent of an increase in punishment, and the majority's conclusion that judicial fact-finding increases the defendant's *exposure* to criminal punishment can only be reached by disregarding the United States Supreme Court's line of Due Process Clause cases.

If the majority is correct and judges in our system are finding facts "essential to the punishment" by finding facts that extend the period before a defendant becomes eligible for parole, then it must in the interests of consistency also resolve that facts found by a parole board that operate to deny parole are facts "essential to the punishment" and must therefore also be ascertained by a jury. Yet the Supreme Court has made clear that this is not the case. *Greenholtz*, 442 US at 11. Indeed, not only has the Court never required a jury to find facts relevant to the denial of parole in that context, but it has stated that those facts may be found by members of the parole board, who are neither jurors nor judges. *Morrissey*, 408 US at 489.

Parole is a mere "permit" to serve a part of one's criminal sentence outside prison. MCL 791.238. Just as a criminal defendant might prefer to spend the part of his or her punishment served in prison in minimum security rather than maximum security, and just

52

as the defendant might have 1,001 other preferences and objections concerning the environment within which the prison part of that punishment is served, he or she might also prefer to spend a part of that punishment on parole. But again, the preference and perspective of the defendant is not what determines what is "punishment." Both Michigan law and precedent and United States Supreme Court precedent clearly answer the dispositive question whether a judge in our state increases a defendant's "punishment" when he or she finds facts that operate to delay parole eligibility. Yet the majority strikes down Michigan's sentencing system on the basis of a contrary answer to this same question.

The majority declares that *Alleyne* has altered the legal landscape to the extent that our sentencing scheme is now unconstitutional under *Apprendi*, but the only part of that landscape that has changed is that *Apprendi* now applies to both maximum and mandatory minimum sentences. Yet the landscape constructed by *Apprendi*, which *Alleyne* did nothing to alter, only applied to determinate sentencing systems.[38] As a result, the majority has applied in error a constitutional rule that was inapplicable in the first place. Under *Apprendi*, a fact must be submitted to the jury only if it *increases the punishment*. In Michigan, however, the process of scoring offense variables to compute a

_____

[38] Before *Alleyne*, the judge could unilaterally increase the bottom end of this sentence range authorized by the jury's verdict. Thus, the judge could increase the range from 3 to 10 years to 5 to 10 years. *Alleyne* clearly stands for the proposition that *both* ends of this range are constitutionally significant and that judges can no longer alter either end of the range produced by the jury's verdict. What the majority fails to recognize is that the constitutional problem identified in *Alleyne* does not exist in systems in which the jury's verdict establishes a single number and not a sentence range.

minimum parole eligibility date does not increase the punishment to which a defendant is exposed. Once a jury finds a defendant guilty, the jury has at that point authorized criminal punishment up to the statutory maximum and the judge has no ability to sentence beyond that limit. Thus, the judge can alter only the parole eligibility date, which, as explained, bears no *constitutional* significance, whatever the obvious differences in character between incarceration and parole.

In other words, Michigan's system is virtually identical to the common-law system that Justice Thomas, in a part of his opinion joined only by Justices Ginsburg, Sotomayor, and Kagan, described approvingly in *Alleyne*:

> At common law, the relationship between crime and punishment was clear. As discussed in *Apprendi,* "[t]he substantive criminal law tended to be sanction-specific," meaning "it prescribed a particular sentence for each offense." The system left judges with little sentencing discretion: once the facts of the offense were determined by the jury, the "judge was meant simply to impose [the prescribed] sentence." [*Alleyne*, 570 US at ___; 133 S Ct at 2158 (citations omitted) (alterations in original).]

In Michigan, our criminal law is also "sanction-specific," meaning that it prescribes a particular sentence for each offense. The jury finds the facts relevant to the imposition of criminal punishment, and once the facts of the offense are determined by the jury, the judge simply imposes the prescribed sentence.[39]

---

[39] *Unlike* the common law, Michigan law established a parole system that allows prisoners to be released before serving the entirety of the punishment imposed on them as a result of the jury's verdict, but this does not alter the constitutional analysis because criminal defendants have no constitutional right to parole. *Greenholtz*, 442 US at 11. Because defendants have no such right, there is only a single date at sentencing that is constitutionally significant and that is the date resulting from the statutory maximum. As a result, our system mirrors that of the common law for purposes of a constitutional analysis.

54

The plurality part of *Alleyne* then proceeded to recognize the transition from the common law toward determinate sentencing systems in which general facts found by the jury produce a range of permissible sentences and particular and more specific facts, if also found by the jury, increase this range:

> While some early American statutes provided *ranges* of permissible sentences, K. Stith & J. Cabranes, Fear of Judging: Sentencing Guidelines in the Federal Courts 9 (1998), the ranges themselves were linked to particular facts constituting the elements of the crime. *E.g., Lacy v. State,* 15 Wis. 13 (1862) (discussing arson statute that provided for a sentence of 7 to 14 years where the house was occupied at the time of the offense, but a sentence of 3 to 10 if it was not); Ga. Penal Code §§4324–4325 (1867) (robbery "by open force or violence" was punishable by 4 to 20 years' imprisonment, while "[r]obbery by intimidation, or without using force and violence," was punishable by 2 to 5 years' imprisonment). This linkage of facts with particular sentence ranges (defined by both the minimum and the maximum) reflects the intimate connection between crime and punishment. [*Id.* at ___; 133 S Ct at 2158.]

This passage specifically describes the type of system that both *Alleyne* and *Apprendi* restrict because the jury no longer authorizes a specific sentence in these systems; rather, it authorizes a sentence range. Because the jury's verdict authorizes a range instead of a fixed punishment, judicial alteration of this range is no different from judicial alteration of the fixed common-law sentence that was authorized by the jury's verdict.

For example, in a statutory scheme in which arson is punishable by imprisonment for 7 to 14 years when a residence is occupied at the time of the offense, but a sentence of 3 to 10 years if it is not, it is for the jury to decide which offense the defendant committed. If the jury decides that the house was not occupied, it limits the court's authority to sentence the defendant to a range of 3 to 10 years, and the judge cannot find to the contrary that the house was occupied and then alter the range to 7 to 14 years. To

55

do so would be to find a fact "essential to the punishment sought to be inflicted." The judge would improperly be impinging on the jury's authority in regard to criminal punishments. Michigan's sentencing system does not allow the jury to authorize a range of permissible sentences, and thus our system is identical to the common-law system for purposes of the present constitutional analysis. In our system, arson of a dwelling is punishable by imprisonment for up to 20 years, MCL 750.73, but arson of a structure that is *not* a dwelling is only punishable by up to 10 years, MCL 750.74. When the jury returns a verdict finding the defendant guilty of arson of a building that is not a dwelling, the judge cannot find that the building was a dwelling and increase the punishment associated with the crime from 10 to 20 years. If the judge were to do this, it would be equivalent to an increase in the sentence range from 3 to 10 years to 7 to 14 years under the previous example. This would violate the defendant's right to a jury trial because the court would by itself have expanded the defendant's maximum exposure to punishment. That is, the judge would be finding facts "essential to the punishment sought to be inflicted" and the power to find those facts reposes exclusively within the domain of juries. See *Apprendi*, 530 US at 510; *Alleyne*, 570 US at ___; 133 S Ct at 2158-2159.

However, it does not violate the defendant's right to a jury trial when the trial court imposes the *precise punishment* the jury has authorized because the Sixth Amendment concerns the authority of the jury. *Blakely*, 542 US at 308-309. If the judge cannot interfere with the authority of the jury to impose criminal punishment, there can be no Sixth Amendment violation. *Id*. It truly is as simple as that, as "the Sixth Amendment by its terms is not a limitation on judicial power, but a reservation of jury power. It limits judicial power only to the extent that the claimed judicial power

56

infringes on the province of the jury." *Id*. Any discretion our judges possess at sentencing cannot be exercised at the "expense of the jury's traditional function of finding the facts essential to lawful imposition of the penalty." *Id*. at 309. As a result, our system does not violate, or even implicate, the Sixth Amendment. The majority, I respectfully believe, errs by holding otherwise.

## V. IRONY

For the reasons set forth in this opinion, I disagree with the analysis of the majority. However, this disagreement is largely confined to the majority's analysis of what the United States Supreme Court has said is required by the Sixth Amendment of the Constitution. The majority's having reached the conclusion it does-- that Michigan's sentencing system is unconstitutional-- I cannot fairly hold the majority responsible for the public policy *consequences* of what it believes to be constitutionally required. If Michigan's sentencing system indeed violates the Sixth Amendment, it cannot be maintained and an alternative sentencing system must be established in its place. Nonetheless, in reflecting upon the very substantial practical consequences of today's decision for our state's criminal justice process, I cannot help but view the new reality that has been created by this Court as deeply marked by irony. And such irony does, to my mind, cast further doubt about whether the majority's interpretations of the United States Supreme Court's decisions in *Apprendi* and *Alleyne* are correct. How can there be such a great disparity between the expressed concerns and purposes of the Supreme Court in these decisions and their real-world effect in Michigan? How can there be such a

"disconnect" between the constitutional impulses apparently underlying these decisions and the specific dislocations they will cause to our state's criminal justice process?

*First*, it is ironic that two decisions of the United States Supreme Court intended to limit what that Court viewed as the encroaching power of the *judiciary* on the authority of the *jury* would lead to an *expansion* of the power of the former and a *diminution* in the authority of the latter. Rather than being constrained by a relatively narrow guidelines range that, for example, requires a defendant to be sentenced to a term of 8 to 10 years and allows the court to depart upward or downward from that range *only* upon a showing of "substantial and compelling circumstances," today's decision empowers the court to sentence that same defendant to *any* term between zero years and the statutory maximum with almost no meaningful appellate review. Not only does this result in a substantial *broadening* of the power of judges, but it also results in a substantial *diminishing* of the authority of juries. While the jury will continue to determine what statutory maximum applies, its decision will no longer determine the choice of the earliest parole date applicable to the conviction offense. From the perspective of a majority that views this parole date as defining a "punishment," this constitutes a considerable curtailment in the breadth of the jury's *constitutional* authority to authorize the terms of punishment, and from the perspective of this dissent, it constitutes a considerable curtailment in the breadth of the jury's *statutory* authority to determine the penal consequences of criminal misconduct.

*Second*, it is ironic that two decisions of the United States Supreme Court designed to foster predictability and certainty in criminal sentencing, see *Alleyne*, 570 US at ___; 133 S Ct at 2161 ("Defining facts that increase a mandatory statutory minimum to be part

58

of the substantive offense enables the defendant to predict the legally applicable penalty from the face of the indictment."); *Apprendi*, 530 US at 478-479, would lead to a criminal justice process in which there will be considerably *less* predictability and certainty. This is the result of the nullification of a sentencing guidelines system designed to achieve exactly the kind of predictability referred to in those decisions and its replacement by a system of broad judicial discretion that makes it almost impossible for a defendant, or a prosecutor, to predict with reasonable certainty what sentences will be imposed. Instead, the only thing that is now "predictable" is that the practical consequences for an intelligent plea-bargaining process are likely to be considerable.

*Third*, it is ironic that two decisions of the United States Supreme Court intended to protect defendants' rights would lead to an erosion of one of the most important protections afforded defendants by our state's criminal justice system. The Sixth Amendment and Due Process Clause guarantee criminal defendants the right to a jury trial precisely in order to protect them from the abuse of state power. *Duncan*, 391 US at 155. However, in the place of a sentencing system that has effectively *limited* the potential abuse of state power by sharply curtailing the exercise of discretion by judges in determining specific criminal sentences, defendants will now be relegated to a system in which they face nearly unfettered exercises of discretion by judges. A step has been taken backward from the equal rule of the law and toward the discretionary rule of the judge.

*Fourth*, it is ironic that two decisions of the United States Supreme Court designed to preserve the authority of that most republican of American constitutional institutions, the jury, would lead to an expansion in the power of that least republican of American

constitutional institutions, the judge. This expansion of judicial power comes at the direct expense of the people and their representatives, whose contrary judgments in setting binding sentencing guidelines have been overturned. Sentences thus will become *more* a function of the personal attitudes and viewpoints of 586 judges and *less* a function of the perspectives of the citizenry as a whole.

*Fifth*, it is ironic that two decisions of the United States Supreme Court premised on a defendant's right to fairness in the sentencing process, grounded in the Sixth Amendment and Due Process Clauses of the Constitution, would lead to the nullification of guidelines predicated on this identical premise. Our Legislature established the sentencing guidelines "intending to reduce unjustified disparities at sentencing." *People v Babcock*, 469 Mich 247, 267 n 21; 666 NW2d 231 (2003). The guidelines were intended to produce a system in which similarly situated defendants would be sentenced in a reasonably similar manner, rather than having one defendant sentenced by Judge Maximum Mike to a 12-year term and another defendant sentenced by Judge Lenient Larry to a 4-year term. This pursuit of sentencing uniformity and consistency as the lodestar of our justice system has now given way to a rule of deference to the widely disparate judgments of 586 judges.

*Sixth*, it is ironic that although the majority holds that under *Alleyne* the *minimum* end of sentence ranges under our sentencing guidelines impermissibly infringes the jury's authority, the majority has chosen to apply the exceedingly broad remedy of *Apprendi* and *Booker*-- cases involving the *maximum* end of sentencing guidelines-- that operate to *diminish* the authority of the jury rather than enhance it. In *Booker*, the Supreme Court in

60

support of its *Apprendi* analysis implemented a remedy rendering the guidelines advisory in an effort to protect the authority of the jury in setting a defendant's maximum exposure to punishment. Then, in *Alleyne*, the Supreme Court implemented a narrow remedy and held that facts increasing the minimum sentence must be submitted to the jury in order to protect the jury's authority with respect to a defendant's minimum exposure to punishment. This Court has already recognized in *Drohan* that the constitutional deficiency relating to the *maximum* sentence does not exist within our system (and the majority does not question this), and as a result the remedy of *Booker* is inapt. Now, the majority holds that there is a constitutional deficiency relating to the *minimum* sentence, and apparently *only* the minimum sentence, yet instead of adopting the narrow remedy of *Alleyne*, the majority adopts the exceedingly broad remedy of *Apprendi* and *Booker*. By applying *this* remedy designed to cure a *different* constitutional deficiency than is identified in the present case, the majority renders the jury irrelevant in determining the minimum sentence while again significantly expanding the power of the judge. The majority adopts without consideration of alternatives an exceedingly broad remedy that might be appropriate for an *Apprendi*/*Booker* violation, but is far less appropriate for an *Alleyne* violation, for which the Supreme Court has crafted a specifically tailored and considerably narrower and more focused remedy.[40]

---

[40] Because I conclude that Michigan's sentencing system does not violate the Sixth Amendment, I need not address the appropriate remedy for what I view as a nonexistent violation. Nonetheless, I submit that the majority has not been persuasive in its adoption without modification or significant analysis the so-called *Booker* remedy that renders the

sentencing guidelines "advisory only" (meaning that the guidelines no longer have any binding effect) and imposing a "reasonableness" standard of review for sentences that depart from the now-advisory guidelines (meaning that the guidelines no longer have even any presumptive effect).  The United States Supreme Court in *Booker* engaged in a lengthy severability analysis that sought to discern and maintain to the extent possible the legislative intentions of the *Congress*.  See *Booker*, 543 US at 246 ("We seek to determine what 'Congress would have intended' in light of the Court's constitutional holding.").  This Court, on the other hand, by its severability analysis is obligated to discern the legislative intentions of our *Legislature*.  By simply importing the *Booker* remedy to Michigan with no particularized analysis of our own Legislature's intentions and no assessment of available alternative approaches to severability, the majority misapprehends its judicial obligations after it has struck down a law of this state.  *Booker*, for example, set forth the "reasonableness" standard of review for departures from the federal guidelines because the "pre-2003 text [of 18 USC 3742(e)] directed appellate courts to review sentences that reflected an applicable Guidelines range for correctness, but to review other sentences—those that fell 'outside the applicable Guideline range'— with a view toward determining whether such a sentence '*is unreasonable . . . .*' " *Id*. at 261, quoting 18 USC 3742(e)(3).  "In other words, the text [of 18 USC 3742(e)(3)] told appellate courts to determine whether the sentence is 'unreasonable' with regard to [18 USC] 3553(a)." *Id*.  *Only* for this reason did the United States Supreme Court "read the statute as implying this appellate review standard—a standard consistent with appellate sentencing practice during the last two decades." *Id*. at 261-262.  However, in Michigan, before the enactment of the legislative sentencing guidelines, appellate courts reviewed sentences under the judicial guidelines for "proportionality."  *People v Milbourn*, 435 Mich 630, 636; 461 NW2d 1 (1980) ("[A] given sentence can be said to constitute an abuse of discretion if that sentence violates the principle of proportionality, which requires sentences imposed by the trial court to be proportionate to the seriousness of the circumstances surrounding the offense and the offender.").  Accordingly, the standard of review summarily imposed in Michigan by the majority is disconnected from any consideration of *this state's* prior standard of review, however irrelevantly consistent it may be with the United States Supreme Court's post-severability analysis standard.

Nor does the majority even acknowledge, much less discuss, Justice Stevens's lengthy dissent in *Booker* (joined by Justices Scalia and Souter), in which he argued that the remedy adopted by the majority in that case (also adopted by the majority in this case) undermined the motivating purpose underlying the guidelines to an unnecessary extent. In enacting the federal guidelines, "Congress revealed both an unmistakable preference for the certainty of a binding regime and a deep suspicion of judges' ability to reduce disparities in federal sentencing." *Booker*, 543 US at 292 (Stevens, J., dissenting in part). When *Booker* made the entire sentencing system "advisory," as the majority does in the

instant case, it created a sentencing regime that was "stark[ly]" different from the one Congress had intended. *Id*. at 300. Furthermore, Justice Stevens believed that the majority's decision to modify the guidelines by striking down the portions making them mandatory was an "extraordinary" "exercise of legislative, rather than judicial, power," *id*. at 272, 274, because the guidelines were not facially unconstitutional; that is, the guidelines *could* be constitutionally applied in situations in which the judge did not find facts that increased the defendant's punishment, *id*. at 275-276. It was only when the *judge* himself found such facts that the guidelines were *applied* in an unconstitutional manner. Justice Stevens advocated a remedy that did not contemplate a wholesale revision of the guidelines, but rather one that merely prevented judges from finding facts that increased the range of punishment faced by the defendant. He believed this remedy to be the most appropriate because it retained the mandatory character of the guidelines, which in his view constituted the "heart" of the guidelines system, *id*. at 299, and it also left the guidelines intact in all other situations in which a judge does *not* find facts that increase the defendant's punishment or the jury decides those facts. The majority here apparently did not even consider such a remedy despite the fact that, as with the federal guidelines, there is ample evidence that the mandatory character of Michigan's guidelines was also viewed by *our* Legislature as an essential characteristic, particularly in light of the fact that the guidelines were enacted specifically to replace Michigan's nonbinding judicial guidelines. That is, our guidelines could similarly be applied in a constitutional manner as long as the *judge* does not find facts that increase a defendant's punishment, or the *jury* does.

I am also unpersuaded by the majority's assertion that if an *Alleyne* objection is unpreserved and pending on direct appeal, a remand is required "to determine whether [the sentencing] court would have imposed a *materially* different sentence but for the constitutional error." (Emphasis added.) While the majority is correct that the appropriate standard of review for an unpreserved claim of constitutional error is whether a "plain error affected substantial rights," *People v Carines*, 460 Mich 750, 763; 597 NW2d 130 (1999), a defendant's "substantial rights" would seem to have been affected by even a few months or weeks or days of unconstitutional incarceration. Why should not *any* defendant whose sentence is pending and who has been adversely affected by the now-defunct sentencing guidelines receive an opportunity for resentencing? Which now-unconstitutional lengthier terms of incarceration are viewed as sufficiently "material" to warrant relief?

## VI. CONCLUSION

I conclude that under the Sixth Amendment a criminal defendant is not entitled to a jury determination of facts necessary to establish his or her minimum parole eligibility date. Under Michigan's sentencing system, the jury has the authority to render a defendant subject to the statutory maximum punishment, and the judge has no influence over this authority or any authority to usurp it. The judge's exercise of judgment in establishing a parole eligibility date does not infringe the authority of the jury and does not violate the Sixth Amendment of the United States Constitution. Furthermore, Michigan's indeterminate sentencing guidelines do not produce "mandatory minimum" criminal sentences, and because *Alleyne* only applies to facts that increase "mandatory minimum" sentences, *Alleyne* is inapplicable to our state's guidelines. Therefore, I conclude that Michigan's sentencing system does not offend the Sixth Amendment and would therefore affirm the judgment of the Court of Appeals.

Stephen J. Markman
Brian K. Zahra